Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/30/2016 08:09 AM CDT

Kristina J. Hartley, appellee, v.
Metropolitan Utilities District
of Omaha, appellant.
___ N.W.2d ___

Filed September 30, 2016.    No. S-15-976.

1. **Directed Verdict: Evidence.** A directed verdict is proper only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law.

2. **Directed Verdict: Appeal and Error.** In reviewing a directed verdict, an appellate court gives the nonmoving party the benefit of every controverted fact and all reasonable inferences from the evidence.

3. **New Trial: Appeal and Error.** An appellate court reviews a trial court's ruling on a motion for a new trial for abuse of discretion.

4. **Judges: Words and Phrases.** A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

5. **Trial: Evidence: Appeal and Error.** A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.

6. **Fair Employment Practices: Attorney Fees: Appeal and Error.** The amount of attorney fees awarded in an action under the Nebraska Fair Employment Practice Act is addressed to the discretion of the trial court, whose ruling will not be disturbed on appeal in the absence of an abuse of discretion.

7. **Evidence: Appeal and Error.** In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party.

8. **Discrimination: Proof.** The *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), framework is designed to force an employer to reveal information that is available

only to the employer, i.e., any unstated reasons for taking the alleged discriminatory action, as well as any discretionary factors underlying its decision.

 9. \_\_\_\_: \_\_\_\_. At all times in an unlawful discrimination case, the ultimate burden of persuasion by a greater weight of the evidence remains with the plaintiff.

10. **Employer and Employee: Discrimination: Proof.** A prima facie case of discrimination in a failure-to-promote claim consists of demonstrating (1) the employee is a member of a protected group, (2) the employee was qualified and applied for a promotion to an available position, (3) the employee was rejected, and (4) a similarly situated employee, not part of the protected group, was promoted instead.

11. \_\_\_\_: \_\_\_\_: \_\_\_\_. In an employment discrimination action, the plaintiff's prima facie case eliminates the most likely legitimate explanations for the employer's adverse action, such as lack of qualifications and the absence of a job opening.

12. \_\_\_\_: \_\_\_\_: \_\_\_\_. Once the plaintiff has established a prima facie case of discrimination, the burden of production shifts to the employer to rebut the prima facie case by producing clear and reasonably specific admissible evidence that would support a finding that unlawful discrimination was not the cause of the employment action.

13. \_\_\_\_: \_\_\_\_: \_\_\_\_. In an employment discrimination action, after the employer has presented a sufficient, neutral explanation for its decision, the question is whether there is sufficient evidence from which a jury could conclude that the employer made its decision based on the employee's protected characteristic, despite the employer's proffered explanation.

14. **Discrimination: Judgments.** Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors, and courts should not treat discrimination differently from other ultimate questions of fact.

15. **Employer and Employee: Discrimination.** In an employment discrimination action, where the employer contends that the selected candidate was more qualified for the position than the plaintiff, a comparative analysis of the qualifications is relevant to determine whether there is reason to disbelieve the employer's proffered reason for its employment decision.

Appeal from the District Court for Douglas County: Marlon A. Polk, Judge. Affirmed.

Mark Mendenhall, of Metropolitan Utilities District of Omaha, for appellant.

Joy Shiffermiller and Abby Osborn, of Shiffermiller Law Office, P.C., L.L.O., for appellee.

Heavican, C.J., Wright, Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

Wright, J.

## I. NATURE OF CASE

Metropolitan Utilities District of Omaha (MUD) appeals from a verdict in favor of Kristina J. Hartley in a gender discrimination action under the Nebraska Fair Employment Practice Act (NFEPA).[1] Hartley sought to prove that she was not promoted because of gender discrimination and that MUD's stated reasons for promoting a male colleague, David Stroebele, instead of her were pretextual. Hartley asserted that she and the two other female applicants, Sherri Meisinger and Shala Chevalier, were better qualified than Stroebele or any of the male applicants. The jury returned a verdict in Hartley's favor. On appeal, MUD asserts that the evidence was insufficient to support the jury's verdict. It claims the district court erred in excluding postpromotional performance evaluations of Hartley. It claims the attorney fees awarded to Hartley were excessive.

## II. BACKGROUND

Hartley was a senior engineering technician when the position of supervisor of field engineering was posted. Stephanie Henn was senior plant engineer and Hartley's direct supervisor from 2003 to 2009. Henn was promoted to director of plant engineering in February 2009, and John Velehradsky became Hartley's direct supervisor. Velehradsky reported directly to Henn.

### 1. Job Description

The supervisor of field engineering position was posted on January 20, 2010. The supervisor was responsible for

---

[1] Neb. Rev. Stat. § 48-1101 et seq. (Reissue 2010).

planning, directing, and supervising the work of 17 field engineering and utility locator personnel of the plant engineering division.

There were several minimum requirements for the position, including "two years of college in an area related to Engineering. Four-year Engineering, or Engineering Technology degree preferred" and "[m]ust have utility locating experience in the last five (5) years, preferable in an ongoing capacity. Utility Locator operator qualification preferred."

With one notable change, the 2010 posting was similar to the posting for the same position previously in 2003, when another individual was hired as the supervisor. Before the position was posted, Henn added the requirement that the applicant must have recent locating experience, within the past 5 years. Before Henn's changes, locating experience was not required for the position.

Utility locating is the process of locating existing gas or water utilities in the field. Originally, locating was not part of a senior engineering technician's job and was only part of the job of designated utility locators. Locating was added as part of a senior engineering technician's job responsibilities when the designated utility locators became overwhelmed by the demands of new construction.

The meaning of "utility locating experience" as stated in the job description was unclear. Gas and water lines are located either using magnetic field detectors (electronic locating) or referring to "as-built" paper forms that essentially provide a map of where such lines should be (document locating). According to the testimony of MUD employees, one type of locating is not more important than the other. In fact, document locating was utilized more often. Electronic locating was sometimes ineffective due to interference by other power signals nearby.

There was conflicting testimony as to the importance of locating experience for the supervisor of field engineering position. Henn testified that she did not have any locating experience and did not know how to locate. The outgoing

supervisor of field engineering likewise did not know how to locate. Still, Henn opined that it was important for the person filling the supervisor position to have the ability to locate. She explained that this position would supervise the utility locators and engineering technicians who were able to locate. Further, a supervisor who knew how to locate could personally help the claims department verify whether any accidental hits of utility lines were MUD's fault, thereby reducing costs.

As far as the requirement that the locating experience be recent, Henn testified that the software of the electronic locating machines changes over time. Anyone without recent experience would have to learn the new software. But other MUD employees testified that even if electronic locating experience were important, it did not make sense to require that experience to be recent. The basics of locating had not changed over the years. Though equipment was getting better, it was easy to understand how to use the new equipment.

As to the meaning of "two years of college in an area related to Engineering," communications at MUD relating to the supervisor position indicated that it was 60 to 72 hours of coursework, equivalent to 2 years of full-time college. There were no specifically prescribed courses.

## 2. APPLICANTS

Hartley testified that when she told Henn that she was interested in the supervisor position, Henn seemed to discourage her from applying. Hartley applied anyway. Ultimately, there were 11 applicants. Hartley, Chevalier, and Meisinger were the only female applicants.

There was no argument that any of the seven male applicants not chosen for the promotion were better qualified than any of the three female applicants. Hartley testified that she believed gender discrimination was involved in the decision to hire Stroebele over herself and the other two female applicants, because they were each better qualified than Stroebele. Hartley also asserted there was bias in the job description and

in the manner of handling the female applicants' performance appraisals and interviews.

According to MUD's personnel policies, performance appraisals were to be conducted annually during the month in which the employee's anniversary date for the position occurs. But Henn had not evaluated Hartley's performance through an official performance appraisal in the 7 years she had been Hartley's supervisor. Stroebele had not had a performance appraisal in the past 4 years. Henn testified that she "should have been" conducting annual performance appraisals, but that she "was really busy." In an internal memorandum dated April 20, 2009, human resources encouraged supervisors to get their employee files up to date, noting there had been several job selection grievances that were difficult to evaluate without written documentation of that employee's performance.

Velehradsky testified that he had five employees with overdue appraisals, including Hartley and Stroebele. Because he had never done a performance appraisal, Henn completed the first one, allowing Velehradsky to observe the process. They decided the first performance appraisal would be of Stroebele. Neither Henn nor Velehradsky could explain why they decided to do Stroebele's appraisal first.

#### (a) Stroebele

Stroebele was one of the newest MUD hires out of the 11 applicants. In fact, he was 10th in seniority out of the 11 applicants for the position of supervisor of field engineering.

Stroebele began working at MUD in 1997 as a pipelayer trainee, an entry-level position for a construction worker. Before working for MUD, Stroebele worked as a laborer with a construction company. Stroebele thought he may have met Hartley as she inspected work he had done while working as a construction worker. Though Stroebele could not be certain it was Hartley, he noted that the inspector was a woman and "there's [sic] not too many females that do that job at MUD."

Stroebele served in the U.S. Naval Reserve from 1998 to 2004, training people on heavy equipment usage.

After 2 years as a trainee at MUD, Stroebele became a pipelayer. Later, he was promoted to machine operator. In 2000, Stroebele was promoted to field engineer II. He did not begin working as senior engineering technician until 2005. The primary difference between a field engineer and a senior engineering technician is supervisory responsibilities, including monitoring third-party contractors.

Stroebele had less formal education than any of the female applicants. He did not receive his 2-year associate degree in applied science, general studies, until May 2011. As of the end of the spring 1999-2000 school term, Stroebele had completed a total of 61.5 credit hours. Forty of those hours were transferred from another community college. At least half of those credit hours were in fields unrelated to engineering, such as psychology, history, astronomy, and English.

Stroebele's performance appraisal was conducted in November 2009, and it was overwhelmingly positive. November was not the month of Stroebele's hiring anniversary date.

It was noted in the appraisal that Stroebele "has not had a preventable injury or accident, not only since his last appraisal, but in his whole [MUD] career (since 1997)! This is highly commendable, as [Stroebele] has worked in 3 different areas since he started with [MUD]." He was described as organized and as completing his work in a timely manner. It was noted that Stroebele was a good example to his coworkers in the manner in which he kept up with paperwork, even helping others when they were behind. He was described as an excellent communicator, who "knows when to call me to get me involved and when he can make the decision on his own." Further, he "portrays a very professional attitude."

But Stroebele had two chargeable locating hits in the last 3½ years. Chargeable locating hits are when errors in locating cause a gas or water line to be hit and damaged. The appraisal cited, "[c]ontinue excellent performance," as the only "performance goals" to be accomplished before the

next appraisal. Stroebele was described as an employee who showed "potential for additional responsibilities through self-motivation, initiative and satisfactory performance of current job duties." No other performance appraisals of Stroebele are in the record.

### (b) Hartley

Hartley has a bachelor's degree in interior design. She began working for MUD in customer service in 1984 and at the time of the promotional decision in question, had been working at MUD for 25 years. Hartley had the most seniority of the female applicants for the supervisor of field engineering position.

She was promoted to drafting technician IV in 1986, drafting technician III in 1988, drafting technician I in 1989, senior drafting technician in 1991, and senior engineering technician in plant engineering in 1994. She had continuously worked as a senior engineering technician for the 16 years prior to the posting of the supervisor position at issue.

Hartley testified that when she was hired into the position of senior engineering technician, she was initially hired only part time, because her supervisor was concerned whether a female could do the job. Hartley stated that she had many years of experience locating at MUD, both document and electronic locating. She also had training responsibilities as a senior engineering technician, training any new technicians as they were hired. Hartley testified that she trained three of the senior engineering technicians then working in her department, including Stroebele.

Hartley stated that as senior engineering technician, she, among her peers, was usually given the most difficult assignments. These included rapid-expansion areas that often had electrical interference and that, as a result, required that she call in a locator to use special equipment to which only the dedicated locators had access.

Just 3 days before she interviewed for the position, Hartley received her first performance appraisal in 7 years. It was not

the month of her hiring anniversary date. Velehradsky had been Hartley's supervisor for less than a year when he wrote her performance appraisal, but it referenced events and evaluated performance before Velehradsky was her supervisor.

As a performance goal, Velehradsky identified that Hartley should "[l]isten more effectively and evaluate a situation before coming to any conclusion." Under the communication section of Hartley's appraisal, Velehradsky stated, "Sometimes [Hartley] is more apt to talk than listen. Hartley "needs to concentrate on listening more closely before she jumps in to respond." Velehradsky also stated that Hartley "needs to work on improving her listening and communication skills before she would be ready to supervise others at the level of her current position."

Other aspects of the appraisal were positive. It was noted that Hartley had not had any chargeable locating hits since 2005. She was organized, and she accomplished her work in a timely manner, "adjusting her schedule as necessary to accomplish her work on multiple projects on a daily basis." As for safety, it was noted, "Since 2006, [Hartley] has remained accident and injury free. [Hartley] has worked on identifying and avoiding hazardous situations in the field."

Hartley was described as a good problem-solver, willing to take on additional work when needed, having common sense, dealing well with contractors when solving problems in the field, and dealing with problems as they arise so that they are not allowed to "fester." Hartley received a "Meets Standards" for "Communication" and was described as communicating well most of the time. Particularly, Velehradsky noted that Hartley took good notes and kept contractors, coworkers, and customers informed.

Henn testified at trial that "not only did [Hartley] not get behind, she helped others who were behind." But there was no notation in Hartley's appraisal that she was thereby an excellent example for her coworkers.

Hartley testified she was disappointed not only by the content and unusual timing of the appraisal, but its method

of delivery. She described that Velehradsky walked past her cubicle and "threw" the envelope containing the appraisal onto her desk, saying, "'Go ahead and read that, and come get me later when you have time to go over it.'"

Velehradsky viewed the encounter differently. He testified that he gave the appraisal to Hartley in a normal manner. He said that Hartley immediately opened the appraisal and "unprofessional[ly]" started questioning him within earshot of other employees about why the evaluation purported to go back to 2003.

Hartley perceived the sudden appraisal after 7 years as "their way to try to eliminate me from contention." Hartley testified that she had never before heard from anyone at work that she talked more than she listened. And such a criticism, she thought, ran contrary to past evaluations that marked her as meeting job specifications for communication. Velehradsky thought he had mentioned this issue to Hartley once before, but he had no specific recollection or documentation of such a conversation.

In the employee comments section of her appraisal, Hartley expressed concern about the timing, the lack of prior appraisals, and the fact that she had not previously been informed that there were areas of her performance that needed improvement. Hartley testified that when Velehradsky read her comments, he was "red in the face" and "pretty irate" with her.

Velehradsky told Hartley that the comments were unprofessional. He testified that he had concerns about the accusations Hartley was making against Henn and the fact that Hartley and some of her coworkers were apparently discussing their appraisals with each other. He explained at trial that a performance appraisal is supposed to be a "private document." Hartley was later called to the office of the vice president of engineering and construction, where she described that the vice president also "berated" her for an hour in front of Henn and Velehradsky. The vice president told Hartley that he had thought better of Hartley, a "seasoned SPA" (an acronym for

supervisory, professional, and administrative personnel), that she would write a full page of comments.

In 15 earlier appraisals, from 1986 to 2003, Hartley received overwhelmingly positive feedback of her performance. There was no reference in any of these appraisals to communication problems or inappropriate emotional outbursts. To the contrary, it was repeatedly said that Hartley was a friendly person who was easy to work with. It was noted that she worked well with her coworkers and that her coworkers seemed to enjoy working with her. She was described as a "good communicator" and "polite." In one appraisal, her supervisor noted that Hartley "promotes good will by treating others as she wants to be treated. She is professional, courteous and respectful." In another appraisal, it was specifically noted that Hartley "also listens to the answer and follows advice of fellow employees."

There was no reference in these appraisals to Hartley's needing more reassurance and direction than she ought to. To the contrary, it was noted that she required minimal supervision, that she could generally make good field decisions on her own, and that she used good judgment daily. One appraisal summarized, "[Hartley] is very good at working out problems. She solves some herself, asks for a decision on some, and solves some then advises what she did on others. She does a good job deciding which tactic to use." In another appraisal, her supervisor cited that Hartley "has shown good judgement in coming to me when she has a question or a problem in her section that was beyond her control."

In her performance appraisal before the 2010 appraisal written by Velehradsky, Hartley's supervisor had described her as "an all around good example of [a] dedicated employee who sets a great example for her coworkers."

At trial, Hartley's coworkers testified that they had never observed any of the communication or professionalism deficiencies noted in the 2010 performance appraisal. Meisinger testified that Hartley was "[v]ery friendly, very knowledgeable and very helpful, very willing to help others." Another

coworker testified that he never saw Hartley act inappropriately in their weekly meetings. He stated that it was expected that the field engineers would keep their supervisor "in the loop" when working on a project. Stroebele testified that he never saw any problems with Hartley's performance.

### (c) Chevalier

Chevalier, one of the three female applicants, obtained a 2-year degree in technical drafting and engineering in 1988. The classes Chevalier took for the degree were equal to 84 credit hours. Chevalier began working for MUD in 1993 in drafting, under design engineering. In 1995, she became a "locator/drafter." She was promoted to field engineer II in 2005. She was a field engineer II for approximately 4 years before being promoted to field engineer I. Chevalier said that it was standard practice at MUD to be a field engineer for 2 years before being promoted to a field engineer I. There was no explanation why her promotion took twice that long. She stated that the promotion was "basically a progressive raise" and that "[a]ll the men in the department had been promoted after two years."

Her performance appraisal took place in March 2010, which was not the month of her hiring anniversary date. Chevalier received largely positive feedback, but there was a comment that she needed to show more "professionalism" in the office. It was explained:

Could further improve judgement, professionalism, and set a better example to others by spending less time on personal phone calls and when in the office spend less time away from her work station. At times [Chevalier] will disturb others in the office by talking loudly for everyone to hear her when only the person she is talking to needs to hear.

Despite these comments, Chevalier was evaluated as showing "potential for additional responsibilities."

Chevalier's most recent evaluation prior to 2010 was in March 2007. The 2007 appraisal was generally positive and

stated that she met the standards in all functions. There was a comment that she should "[k]eep the number and length of personal phone calls to a minimum" and a goal to "minimize time spent away from [her] work station." The review described Chevalier as showing potential for additional responsibilities, noting, "[Chevalier] is accountable and responsible and willing to help where she can when asked or if she sees where something needs to be taken care of she will take the initiative to look into it and do what she can to help. Her work overall is satisfactory or above."

Other evaluations dating from 1993 to 2004 showed that Chevalier overwhelmingly met or exceeded all expectations. From 2001 through 2004, there were comments along the lines that she should be "more conscious of the conversations in the office so as not to disrupt or offend others" and to "try and remain calm when issues arise such as changing work assignments and discovery of other employee errors." But between 1993 and 2000, annual appraisals commented that Chevalier communicated very well with the public and MUD personnel and that she demonstrated potential for advancement. Other employees at MUD testified that they never observed any lack of professionalism on Chevalier's part.

### (d) Meisinger

At the time the supervisor position was posted, Meisinger, another female applicant, was a senior design technician in design engineering. She had worked for MUD for a total of 22 years. Meisinger began working for MUD in 1988 through a 2-year internship in the drafting department while she was in college. In 1990, Meisinger began working as a drafting technician at MUD. In that position, she worked in both plant engineering and design engineering. In 1994, Meisinger was promoted to senior drafting technician, and in 1995, Meisinger obtained an undergraduate degree in design engineering technology and she transferred to a position as field engineer.

As a field engineer, Meisinger worked with construction crews to make sure that the water and gas mains were installed at the proper elevation and not in conflict with any proposed construction projects. Meisinger located using both document and electronic locating. In 1999, Meisinger became a design engineer technician in design engineering. In that position, she performed document locating, but not electronic. She was eventually promoted to senior design engineer, and continued to do document locating in that capacity.

Meisinger testified that she was surprised and concerned by the fact that the 2010 job posting had changed to require locating experience within the last 5 years. She believed herself capable of doing electronic locating and stated that "once you learn it, it's — it's easy." But she technically did not have electronic locating experience in the last 5 years.

Unlike Hartley and Chevalier, who worked directly under Henn, Meisinger received yearly performance appraisals from her supervisor. Her appraisals were overwhelmingly positive.

### (e) Interviews and Decision

Hartley, Chevalier, and Meisinger all described their interviews with Henn as seeming to be perfunctory. Chevalier testified that at one point, Henn "kind of sneered and rolled her eyes" at her. Meisinger offered to take the locator-qualified examination, if her locating experience was an issue, but Henn told her that was not necessary.

The three female applicants questioned the unusual timing of their 2010 appraisals. Chevalier doubted that the suddenness of the appraisals was due to the human resources memorandum. She noted the human resources letter came out in 2009. "So if there was a big push, why didn't they do the performance appraisals in 2009?" Rather, Chevalier said, the appraisals were conducted after they applied for the supervisor position.

All three female applicants believed they were passed up for the promotion because of their gender. When Henn later discussed with Meisinger why she did not get the promotion,

Henn explained it was because of Meisinger's lack of recent electronic locating experience. Meisinger testified that she was disappointed, but that she was not that surprised. Meisinger testified that she "knew [Henn] didn't want a female in that position, so I was already prepared at that time." Meisinger testified that because Hartley and Chevalier worked for Henn, they could be eliminated through their 2010 appraisal, but "[m]e, she did not do an appraisal on; so the only way she could eliminate me was by changing the job description or the job posting." Meisinger testified that she had devoted her life to the engineering field, but "it's a lot harder for a female." Meisinger illustrated that at MUD, she had to take special tests to prove she could do certain jobs—tests she later found out her male colleagues did not have to take.

Chevalier testified, "[I]t seems to me that Ms. Henn does not like women. She didn't have any women working for her other than [Hartley] and I. And [Hartley] and I were only under her because we'd been hired by previous supervisors." Chevalier explained that even though women applied for jobs in plant engineering under Henn, no women were hired "out of all the time that Ms. Henn was the supervisor or director of plant engineering"; jobs were "only given to men." In addition, the women who worked for Henn were generally not treated fairly, and she described instances she believed illustrated this point. Henn responded that there had not been other female applicants for positions open under her supervision and noted that only about 10 to 15 percent of engineering employees industrywide are female.

### 3. PROFFERED REASONS FOR PROMOTING STROEBELE OVER OTHER FEMALE APPLICANTS

Henn testified at trial that she hired Stroebele because he was better qualified than any of the female applicants. She thought Hartley was the second-best candidate.

In a letter to human resources, Henn described why she chose Stroebele over Hartley:

[Hartley] has not been able to handle larger or more complex projects. Ms. Hartley requires a lot more help from her supervisor if she encounters anything out of the basic realm of her current position as a Senior Engineering Technician. Mr. Stroebele has taken on larger, more difficult projects and handled them very effectively.

Ms. Hartley has not demonstrated the skills required to be a calm, even-keeled supervisor. On a regular basis, if she encounters a situation that she does not like or gets feedback that is negative, she gets very upset, blows the situation out of proportion, and involves as many coworkers as possible, whether they were involved in the situation or not. This does not demonstrate good judgment or professionalism, which is vital to the Supervisor of Field Engineering position. This does not show that she could be trusted with sensitive information, or handle negative situations well, which are bound to occur in a supervisory position such as this, with 17 subordinates. Mr. Stroebele has exhibited the ability to calmly evaluate a heated and/ or negative situation, coolly make a decision, and proceed with action. . . .

Ms. Hartley, by her own admission, struggles with utility locating. As the Supervisor of Field Engineering, checking the locating work of the utility locators and field engineers is crucial. In order to accurately check the work of subordinates, the Supervisor of Field Engineering needs to know the "ins and outs" of utility locating. Ms. Hartley does not currently exhibit these skills, often needing assistance. Mr. Stroebele has been locating utilities skillfully for nearly a decade, making him the superior candidate.

Ms. Hartley talks much more than listens. She is quick to jump to a conclusion prior to evaluating the entire situation. She has been warned about this in the past. Ms. Hartley needs to learn to listen carefully and allow two way communications to happen with others prior to jumping to a decision. Ms. Hartley has not demonstrated good

listening skills with her coworkers, and therefore this does not bode well for her listening well to her subordinates as the Supervisor of Field Engineering. Mr. Stroebele does not exhibit any of these negative traits.

With regard to "struggl[ing] with utility locating," Henn clarified at trial that Hartley was skilled at locating and had not had a locating hit for 5 years. Hartley's "struggle" was more motivational:

> [Hartley], on a regular basis, complained that she didn't want to do locating. She didn't think she had to do it; she didn't want to. She didn't like it. And she said she wasn't — she even said, "I'm not that good at it, and sometimes I need to call in for help."

Hartley testified, "I didn't say that I didn't want to do it. I said I didn't like to have to do it." Hartley explained that she believed that having field engineers locate draws their attention away from making sure the contractors are doing what they are supposed to be doing. "The contractor knew that if I had to locate something, that came over my inspecting. He could — if he wanted to pull something over me, he could say, [Hartley], I need that located; I need it by tomorrow. I'd have to go do it."

With regard to not handling more complex projects, both Velehradsky and Henn clarified that, in reality, Hartley could and did handle complex projects very competently. Henn testified that Hartley just seemed to want affirmation of her decisions, "like she wanted me nodding my head." Velehradsky testified that Hartley was the "best organized" technician he had at the time Stroebele was promoted. Hartley also had excellent technical skills and experience. But, Velehradsky explained, "I just don't know that she would always use that and try to solve things on her own." Henn testified that she had never told Hartley she should act more independently, because Henn did not mind, and stated that "some of my employees wanted to call me more, I was okay with that." She thought Hartley's need for reassurance would be more problematic if she were a supervisor, however.

With regard to Hartley's talking more than she listens, Henn testified that during their weekly meetings, Hartley "liked to finish other people's sentences. She didn't always want other of her coworkers to talk; she'd jump in pretty quick. And if you're a supervisor running that meeting, it needs to be a collaborative effort. And to me that's really important; that's how you build a team." Velehradsky also observed that Hartley sometimes had a tendency to "try to dominate" the weekly meetings with her coworkers. Velehradsky believed that although Hartley had local, supervisory experience in the drafting section, "she did not have the communication and listening skills to supervise others at her current level."

Finally, with regard to having a tendency to get "upset" or that she "blows the situation out of proportion," Henn and Velehradsky found Hartley's reaction to the 2010 performance appraisal to be unprofessional. The only other incident cited by Henn and Velehradsky for this evaluation of Hartley's character was an incident that took place in early 2008.

In that incident, Henn was called away on a family emergency. Henn told her supervisor that she would not be available, but did not tell her team. Hartley tried to get in touch with Henn with regard to an important issue that had arisen in the field, but was unable to do so. Henn acknowledged that the incident for which Hartley was trying to reach her that day concerned a "very important" problem, where they had run into a lot of ground water in a construction project, and a big change order had to be approved by engineering. Velehradsky recalled that when Hartley could not reach Henn, Hartley "got really agitated about it and raised her voice." Henn testified that the next day when Hartley saw Henn, Hartley told her she was really upset. Hartley wanted to know why she could not reach Henn. Henn "did not appreciate that."

As for Stroebele's being better qualified than the other two female candidates, Henn described that Chevalier had not shown that "she has the skills to be a calm, even-keeled supervisor." Henn illustrated that "[w]hen Ms. Chevalier receives

negative feedback, she chooses to make a very big deal out of it, involve as many coworkers as possible, and blow the situation out of proportion." Henn also described Chevalier as "having a difficult time staying at her work station and concentrating on her job." She made "too many personal phone calls, disturbing others in the office . . . . She tends to be away from her work area and not in the field, instead socializing with others." Henn concluded that these behaviors did "not exhibit good judgment or professionalism, which is critical in the Supervisor of Field Engineering position."

Henn testified that the only reason Meisinger was eliminated as the best candidate for the position was because she did not meet the minimum job requirement of having utility locating experience in the last 5 years.

### 4. Verdict

At the close of the evidence, MUD moved for a directed verdict, asserting that Hartley failed to present sufficient evidence that MUD's stated reasons for hiring Stroebele instead of Hartley were pretexts for unlawful discrimination. The court overruled the motion, and the case went to the jury. The jury returned a verdict in favor of Hartley and awarded her $61,293 in special damages and $50,000 in general damages. MUD's motion for a new trial, making similar insufficiency of the evidence arguments, was overruled. The district court awarded Hartley $56,800 for attorney fees. MUD appeals.

## III. ASSIGNMENTS OF ERROR

MUD assigns that the district court (1) abused its discretion by excluding the testimony of Damian Blackwell and Craig Johnson, (2) erred in overruling MUD's motions for directed verdict and new trial, and (3) abused its discretion by ordering attorney fees that were unreasonable and unnecessary.

## IV. STANDARD OF REVIEW

[1,2] A directed verdict is proper only when reasonable minds cannot differ and can draw but one conclusion from

the evidence, that is, when an issue should be decided as a matter of law.[2] In reviewing that determination, we give the nonmoving party the benefit of every controverted fact and all reasonable inferences from the evidence.[3]

[3,4] We review a trial court's ruling on a motion for a new trial for abuse of discretion.[4] A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[5]

[5] A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.[6]

[6] The amount of attorney fees awarded in an action under the NFEPA is addressed to the discretion of the trial court, whose ruling will not be disturbed on appeal in the absence of an abuse of discretion.[7]

## V. ANALYSIS

### 1. Excluded Testimony

We first address MUD's assertion that the district court erred in excluding the testimony of two potential witnesses, Blackwell and Johnson.

---

[2] *Scheele v. Rains*, 292 Neb. 974, 874 N.W.2d 867 (2016).

[3] *Id.*

[4] *Balames v. Ginn*, 290 Neb. 682, 861 N.W.2d 684 (2015).

[5] *Id.*

[6] *Sharkey v. Board of Regents*, 260 Neb. 166, 615 N.W.2d 889 (2000), *abrogated on other grounds, A.W. v. Lancaster Cty. Sch. Dist. 0001*, 280 Neb. 205, 784 N.W.2d 907 (2010).

[7] See, *White v. Kohout*, 286 Neb. 700, 839 N.W.2d 252 (2013); *Gress v. Gress*, 271 Neb. 122, 710 N.W.2d 318 (2006); *Greenwalt v. Wal-Mart Stores*, 253 Neb. 32, 567 N.W.2d 560 (1997); *Rapp v. Rapp*, 252 Neb. 341, 562 N.W.2d 359 (1997); *Airport Inn v. Nebraska Equal Opp. Comm.*, 217 Neb. 852, 353 N.W.2d 727 (1984).

During trial, the court had sustained objections by MUD to evidence Hartley sought to adduce concerning her performance after the supervisor of field engineering position was filled. In order to call into question the criticisms of Hartley's performance that were noted in the 2010 performance appraisal, Hartley sought to introduce her performance appraisals after 2010 and after her transfer to another department under a different supervisor. MUD objected on relevance and foundation, noting that the appraisals were for a different position and that the appraisals were subsequent to the selection for the supervisor position. The court sustained the objection. It also sustained MUD's similar objection to the admission of a 2011 performance appraisal of Hartley that was conducted by Velehradsky.

Blackwell and Johnson were coworkers of Hartley who would have testified that they observed her "over-speaking and communicating poorly during weekly team meetings" that took place after the promotion decision at issue. Consistent with its ruling excluding proposed testimony by Hartley, the court excluded the proposed testimony of Blackwell and Johnson on the ground that it was postpromotional.

[7] A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.[8] In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party.[9] Because the issue was Hartley's relative qualifications for the supervisor of field engineering promotion, it was not an abuse of discretion for the court to draw a line at evidence of Hartley's performance before that promotional decision was made. And the district court's decision, applied to Hartley and MUD alike, did not unfairly prejudice MUD.

---

[8] *Sharkey v. Board of Regents, supra* note 6.

[9] *Moreno v. City of Gering*, 293 Neb. 320, 878 N.W.2d 529 (2016).

### 2. Sufficiency of Evidence

We turn now to MUD's related assignments of error concerning the denial of its motions for directed verdict and new trial. As to both these assignments of error, MUD argues that there was insufficient evidence to support a finding that MUD's stated reasons for hiring Stroebele over Hartley were pretexts for unlawful discrimination.

The NFEPA states at § 48-1101 that it "is the policy of [Nebraska] to foster the employment of all employable persons in the state on the basis of merit . . . and to safeguard their right to obtain and hold employment without discrimination." The NFEPA provides at § 48-1104(1), in relevant part, that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, disability, marital status, or national origin[.]" The NFEPA is patterned from that part of the Civil Rights Act of 1964 contained in 42 U.S.C. § 2000e et seq. (2012), and it is appropriate to look to federal court decisions construing similar and parent federal legislation.[10] In intentional discrimination cases, liability depends on whether the protected trait actually motivated the employer's decision and had a determinative influence on the outcome.[11]

Hartley's claim is one of disparate treatment—a claim based on an employer's treating some people less favorably than others because of their race, color, religion, sex, or other protected characteristics.[12] The three-part burden-shifting

---

[10] See *Airport Inn v. Nebraska Equal Opp. Comm., supra* note 7.

[11] *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 113 S. Ct. 1701, 123 L. Ed. 2d 338 (1993).

[12] See *Raytheon Co. v. Hernandez*, 540 U.S. 44, 124 S. Ct. 513, 157 L. Ed. 2d 357 (2003).

framework from *McDonnell Douglas Corp. v. Green*[13] is not the exclusive method of proving disparate treatment,[14] but neither party in this appeal contests that *McDonnell Douglas Corp.* frames our analysis of the sufficiency of the evidence to support the jury's verdict.

[8,9] The *McDonnell Douglas Corp.* framework is a procedural device of order of proof and production developed at a time when discrimination cases were tried to judges.[15] It is designed to force an employer to reveal information that is available only to the employer, i.e., any unstated reasons for taking the alleged discriminatory action, as well as any discretionary factors underlying its decision.[16] At all times in an unlawful discrimination case, the ultimate burden of persuasion by a greater weight of the evidence remains with the plaintiff.[17] A greater weight of the evidence is the equivalent of a preponderance of the evidence.[18]

---

[13] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See, also, *Arens v. NEBCO, Inc.*, 291 Neb. 834, 870 N.W.2d 1 (2015); *Riesen v. Irwin Indus. Tool Co.*, 272 Neb. 41, 717 N.W.2d 907 (2006).

[14] See, 1 Barbara T. Lindemann et al., Employment Discrimination Law, ch. 2, § II.A.1 (5th ed. 2012 & Cum. Supp. 2015); Martin J. Katz, *Reclaiming McDonnell Douglas*, 83 Notre Dame L. Rev. 109 (2007). See, also, e.g., *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003).

[15] See *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).

[16] *Hinton v. Conner*, 225 F.R.D. 513 (M.D.N.C. 2005).

[17] *McDonnell Douglas Corp. v. Green, supra* note 13. *St. Mary's Honor Center v. Hicks, supra* note 15 (clarifying that *McDonnell Douglas Corp., supra* note 13, allocates burden of production and order for presentation of evidence; ultimate burden of persuasion, however, rests on plaintiff); *Billingsley v. BFM Liquor Mgmt.*, 264 Neb. 56, 645 N.W.2d 791 (2002); *Humphrey v. Nebraska Public Power Dist.*, 243 Neb. 872, 503 N.W.2d 211 (1993) (quoting *Allen v. AT&T Technologies*, 228 Neb. 503, 423 N.W.2d 424 (1988)).

[18] *Flores v. Flores-Guerrero*, 290 Neb. 248, 859 N.W.2d 578 (2015).

[10] Under *McDonnell Douglas Corp.*, first the plaintiff has the burden of proving a prima facie case of discrimination.[19] A prima facie case of discrimination in a failure-to-promote claim consists of demonstrating (1) the employee is a member of a protected group, (2) the employee was qualified and applied for a promotion to an available position, (3) the employee was rejected, and (4) a similarly situated employee, not part of the protected group, was promoted instead.[20] A plaintiff need not prove his or her *relative* qualifications to meet the prima facie burden.[21]

[11] The plaintiff's prima facie case eliminates the most likely legitimate explanations for the employer's adverse action, such as lack of qualifications and the absence of a job opening.[22] "Once that has been done, an inference arises that an employer subjected a protected class member to an adverse employment action more likely than not because of the consideration of impermissible factors."[23]

[12] Once the plaintiff has established a prima facie case of discrimination, the burden of production shifts to the employer to rebut the prima facie case by producing "clear and reasonably specific"[24] admissible evidence that would support a finding that unlawful discrimination was not the cause of the employment action.[25] When the employer articulates a legitimate, nondiscriminatory reason for the decision, raising a genuine issue of fact as to whether it discriminated

---

[19] *McDonnell Douglas Corp. v. Green, supra* note 13. See, also, *St. Mary's Honor Center v. Hicks, supra* note 15.

[20] See *Allen v. Tobacco Superstore, Inc.*, 475 F.3d 931 (8th Cir. 2007).

[21] See *Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011).

[22] See 1 Lindemann et al., *supra* note 14, ch. 2, § II.A.2.

[23] *Id.* at 2-24 to 2-25.

[24] *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 258, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).

[25] *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002); *St. Mary's Honor Center v. Hicks, supra* note 15.

against the employee, the employer's burden of production created by the employee's prima facie case is satisfied and drops from the case.[26]

[13] After the employer has presented a sufficient, neutral explanation for its decision, the question is whether there is sufficient evidence from which a jury could conclude that the employer made its decision based on the employee's protected characteristic, despite the employer's proffered explanation.[27] At this stage, the employee "must be afforded the 'opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'"[28] "That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'"[29]

On the issue of whether the employer's explanation is pretextual, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom, even though "the presumption of discrimination 'drops out of the picture' once the defendant meets its burden of production."[30] It is permissible for the trier of fact to infer the ultimate fact of unlawful discrimination from the same evidence that would allow the trier of fact to disbelieve the defendant's stated legitimate, nondiscriminatory reason for its decision.[31]

Of course, rejection of the employer's asserted reasons for its actions does not, standing alone, mandate judgment for the plaintiff as a matter of law, because it does not

---

[26] See *Riesen v. Irwin Indus. Tool Co., supra* note 13.

[27] See *Raytheon Co. v. Hernandez, supra* note 12.

[28] *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

[29] *Id.*

[30] *Id.*

[31] *Reeves v. Sanderson Plumbing Products, Inc., supra* note 28.

necessarily establish that the real reason was unlawful discrimination.[32] But proof that the defendant's explanation is unworthy of credence can be "quite persuasive" evidence of intentional discrimination.[33] The trier of fact can infer that "the employer is dissembling to cover up a discriminatory purpose."[34] And "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation."[35]

[14] "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors,"[36] and courts "should not '"treat discrimination differently from other ultimate questions of fact."'"[37] The *McDonnell Douglas Corp.* methodology was "'"never intended to be rigid, mechanized, or ritualistic."'"[38] No matter what test or order of proof is adopted, all relevant direct and circumstantial evidence is considered in its totality in determining whether judgment as a matter of law is warranted in an action alleging unlawful discrimination.[39] "'[T]he ultimate question [is] discrimination *vel non*.'"[40]

MUD conceded that Hartley had made a prima facie case of discrimination. And MUD produced clear and reasonably specific admissible evidence that could support a finding that unlawful discrimination was not the cause of the employment action and that, rather, it promoted Stroebele over Hartley because Stroebele was the better qualified candidate. The

---

[32] See *St. Mary's Honor Center v. Hicks, supra* note 15.

[33] *Reeves v. Sanderson Plumbing Products, Inc., supra* note 28, 530 U.S. at 147.

[34] *Id.*

[35] *Id.*

[36] *Id.*, 530 U.S. at 148.

[37] *Id.*

[38] *St. Mary's Honor Center v. Hicks, supra* note 15, 509 U.S. at 519.

[39] See *Orton-Bell v. Indiana*, 759 F.3d 768 (7th Cir. 2014).

[40] *St. Mary's Honor Center v. Hicks, supra* note 15, 509 U.S. at 518.

issue is whether there was sufficient evidence to sustain the jury's implicit finding that this proffered reason was a pretext for unlawful discrimination.

MUD argues that the jury could not reasonably find its stated reason for the employment decision was a pretext, because Hartley admitted that certain events occurred, which Henn cited as supporting her ultimate conclusion that Hartley was less qualified than Stroebele. MUD explains, "Hartley did not refute either the 2008 event or Ms. Hartley's complaints and struggles with utility locating."[41] Without citing to precedent, MUD argues that Hartley "cannot, as a matter of law, admit two of the reasons MUD has given for the adverse employment decision and then still state the true reason is impermissible."[42] We disagree.

First, in Hartley's testimony, she did not admit to the 2008 incident and she denied struggling with utility locating. Hartley presented evidence that although she mentioned to Henn that she did not think it was a good idea to have field engineers locate, Hartley located in a competent manner without continual complaint. And Hartley presented evidence contradicting other proffered reasons upon which Henn said her decision was based. Hartley presented evidence that she did not interrupt others or have communication difficulties with her coworkers. Hartley presented evidence that given the complexity of the projects to which she was assigned, she did not contact her supervisor more than was necessary.

More to the point, MUD's argument confuses the falsity of an occurrence cited in support of the employer's action with the falsity of the employer's statement that the proffered non-discriminatory reason actually motivated the employer. "If the stated reason for the challenged action did not motivate the action, then it was indeed pretextual."[43] The employee need

---

[41] Brief for appellant at 26.

[42] *Id.*

[43] *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006).

not show that the proffered explanation had no basis in fact and was only "conjured out of thin air."[44]

The employee may demonstrate pretext either by showing that the employer's explanation is unworthy of credence, because it has no basis in fact, or by persuading the court that a prohibited reason more likely motivated the employer.[45] The specific evidence presented to demonstrate discriminatory animus may vary, and its sufficiency will be considered as a whole.[46] The plaintiff may, for instance, demonstrate pretext by showing that (1) the employer's proffered reasons had no basis in fact, (2) the employer's proffered reasons were against the employer's policy or practice or involved other procedural irregularities,[47] (3) the employer's proffered reasons have changed substantially over time or are inconsistent,[48] (4) the plaintiff was the better qualified applicant,[49] (5) the plaintiff had a laudable prior work history,[50] (6) there was a sharp decline in the plaintiff's performance evaluations near the time of the employer's contested action,[51]

---

[44] *Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1084 (8th Cir. 2013). See, also, *Erickson v. Farmland Industries, Inc.*, 271 F.3d 718 (8th Cir. 2001).

[45] *Cox v. First Nat. Bank*, 792 F.3d 936 (8th Cir. 2015).

[46] See, e.g., *Rothmeier v. Investment Advisers, Inc.*, 85 F.3d 1328 (8th Cir. 1996).

[47] See, *Ridout v. JBS USA, LLC, supra* note 44; *Rudin v. Lincoln Land Community College*, 420 F.3d 712 (7th Cir. 2005).

[48] See, *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733 (7th Cir. 2013); *Jones v. National American University*, 608 F.3d 1039 (8th Cir. 2010); *Graham v. Long Island R.R.*, 230 F.3d 34 (2d Cir. 2000); *Morgan v. Hilti, Inc.*, 108 F.3d 1319 (10th Cir. 1997).

[49] See *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 126 S. Ct. 1195, 163 L. Ed. 2d 1053 (2006).

[50] *Spengler v. Worthington Cylinders*, 615 F.3d 481 (6th Cir. 2010); *Lewis v. Heartland Inns of America, L.L.C.*, 591 F.3d 1033 (8th Cir. 2010); 1 Lindemann et al., *supra* note 14.

[51] See, *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782 (8th Cir. (2011); *Davis v. Fleming Companies, Inc.*, 55 F.3d 1369 (8th Cir. 1995), *abrogated on other grounds, Torgerson v. City of Rochester, supra* note 21.

(7) the decisionmaker "'overplayed'" the chosen applicant's strengths,[52] (8) the decisionmaker made statements expressing a discriminatory attitude,[53] (9) statistical analysis demonstrating a pattern and practice of discrimination,[54] (10) comparative evidence that similarly situated persons in a nonprotected class were treated more favorably,[55] and (11) prior instances of disparate treatment of the plaintiff by the defendant in other contexts.[56]

[15] Hartley argues that she presented circumstantial evidence of unlawful discrimination primarily through evidence that she was better qualified for the promotion than Stroebele. Where the employer contends that the selected candidate was more qualified for the position than the plaintiff, a comparative analysis of the qualifications is relevant to determine whether there is reason to disbelieve the employer's proffered reason for its employment decision.[57]

We agree that Hartley presented sufficient evidence upon which the jury could find she was the best qualified candidate for the promotion. Hartley had worked at MUD almost twice as long as Stroebele, and she had worked in the supervisory

---

[52] 1 Lindemann et al., *supra* note 14, ch. 2, § II.C.7 at 2-101. Accord *Dennis v. Columbia Colleton Medical Center, Inc.*, 290 F.3d 639 (4th Cir. 2002).

[53] *Erickson v. Farmland Industries, Inc., supra* note 44.

[54] See, *Lujan v. Franklin County Bd. of Educ.*, 766 F.2d 917 (6th Cir. 1985); *Plemer v. Parsons-Gilbane*, 713 F.2d 1127 (5th Cir. 1983); *Lincoln County Sheriff's Office v. Horne*, 228 Neb. 473, 423 N.W.2d 412 (1988); *Life Technologies Corp. v. Superior Court*, 197 Cal. App. 4th 640, 130 Cal. Rptr. 3d 80 (2011); *Dumont v. City of Seattle*, 148 Wash. App. 850, 200 P.3d 764 (2009).

[55] *McDonnell Douglas Corp. v. Green, supra* note 13; *Conward v. Cambridge School Committee*, 171 F.3d 12 (1st Cir. 1999); *Lincoln County Sheriff's Office v. Horne, supra* note 54; *Dumont v. City of Seattle, supra* note 54.

[56] See, *McDonnell Douglas Corp. v. Green, supra* note 13; *Uffelman v. Lone Star Steel Co.*, 863 F.2d 404 (5th Cir. 1989); 1 Lindemann et al., *supra* note 14, ch. 2, § II.C.7.

[57] *Chock v. Northwest Airlines, Inc.*, 113 F.3d 861 (8th Cir. 1997), *abrogated on other grounds, Torgerson v. City of Rochester, supra* note 21.

position of senior engineering technician for 16 years. She trained Stroebele, who had held that position for only 5 years. Hartley excelled at the job of locating, deemed so essential by Henn, inasmuch as she had no chargeable hits in the last 5 years. In contrast, Stroebele had two chargeable hits in the last 3½ years. Hartley had a 4-year degree in a field related to engineering. It was disputed whether Stroebele even met the minimum education requirements for the position of supervisor of field engineering. Other than Henn's complaints about Hartley's emotionality, neediness, and tendency to interrupt when others were speaking—about which there was contradictory evidence—there was no dispute that Hartley was anything other than extremely competent at performing her job.

Hartley also presented evidence from which the jury could reasonably infer that each of the other female applicants for the promotion to supervisor of field engineering was better qualified than Stroebele. In light of coworker testimony and the similarities in the proffered personality deficiencies, the jury could have disbelieved Henn's statement that Chevalier was less qualified than Stroebele. The jury could have found Chevalier was better qualified than Stroebele due to her superior experience, performance, and education. The jury could have also found that Meisinger was better qualified than Stroebele, because her only alleged deficiency was not having recent electronic locating experience.

Relatedly, the jury could have found upon the evidence presented that there were procedural irregularities that called into question Henn's motivation. The evidence was disputed as to whether recent electronic locating was a legitimate minimum qualification criterion for the promotion. And Henn rejected Meisinger's offer to become certified in electronic locating, while later saying Meisinger's inability to electronically locate was the only reason she was not better qualified than Stroebele. The timing of performance appraisals was also unusual. The jury could have inferred that the sudden appraisals of the applicants for the promotion was a means of creating a paper trail to cover up Henn's discriminatory

decision, rather than simply a response to the memorandum from human resources.

Likewise, the jury could have inferred that Henn's reasons for her decision were pretext for unlawful discrimination when the 2010 appraisal departed so dramatically from so many years of prior, laudable appraisals. At the same time, the jury could have inferred that Stroebele's appraisal overplayed his strengths. Though Henn did not personally write Hartley's appraisal, the jury could have reasonably inferred she influenced it.

The jury could have inferred discriminatory hostility from the manner in which Hartley described being presented with the 2010 appraisal and the response to her complaints.

Lastly, the jury could have inferred dissembling from the factual inaccuracies and exaggerations stated by Henn to human resources to justify her decision that Hartley was less qualified than Stroebele. Only at trial did Henn clarify that Hartley was actually technically competent at locating, that her alleged heightened emotionality "[o]n a regular basis" was supported by only two incidents, and that her cited inability to handle complex projects was really just her need for reassurance.

If there is any evidence that will sustain a finding for the party against whom a motion for judgment as a matter of law is made, we may not second guess the jury's determination.[58] Viewing the evidence as a whole and in a light most favorable to Hartley, we find that there was sufficient evidence to support a reasonable inference that MUD's promotional decision was because of Hartley's gender. Therefore, the court did not err in overruling MUD's motion for a general directed verdict or its related motion for a new trial.

### 3. Attorney Fees

We turn lastly to MUD's assignment of error concerning the attorney fees that were awarded under § 48-1119(4). As

---

[58] See *McLaughlin v. Hellbusch*, 256 Neb. 615, 591 N.W.2d 569 (1999).

in other actions authorizing an award of attorney fees, the amount of the fees awarded in an action under the NFEPA is addressed to the discretion of the trial court, whose ruling will not be disturbed on appeal in the absence of an abuse of discretion.[59]

MUD asserts that the district court abused its discretion in the amount of the fees awarded. MUD states that Hartley's attorney billed at her attorney rate for nonlawyer administrative or paralegal tasks, billed 3 hours in brief preparation that had already been done on another case, billed 2.75 hours preparing jury instructions that were simply model jury instructions, and generally provided insufficient detail in her itemization of $9,556.25 in fees. MUD asserts that a second attorney's involvement in the case was unknown, and "any and all invoicing done by him is wholly unnecessary and excessive."[60]

We find upon our review of the record that both Hartley's attorneys submitted to the district court a detailed itemization of their fees. Hartley's primary attorney explained that she did not have staff to complete all the administrative functions for her and that she did not charge separately any postage, telephone, faxing, or photocopying. Those were built into her hourly rate. The district court did not abuse its discretion in evaluating the amount of attorney fees to be awarded.

## VI. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED.

---

[59] See cases cited *supra* note 7.

[60] Brief for appellant at 32.