IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

MITCHELL V. MANSFIELD

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

COLLEEN E. MITCHELL, APPELLEE,

V.

C. HUGHSON MANSFIELD, APPELLANT.

Filed November 29, 2016.    No. A-15-1118.

Appeal from the District Court for Dawes County: TRAVIS P. O'GORMAN, Judge. Affirmed.

Terrance O. Waite and Kortnei N. Hoeft, of Waite, McWha & Heng, for appellant.

Andrea D. Miller, of Simmons Olsen Law Firm, P.C., for appellee.

MOORE, Chief Judge, and RIEDMANN and BISHOP, Judges.

MOORE, Chief Judge.

## I. INTRODUCTION

C. Hughson Mansfield appeals from the order of the district court for Dawes County, which dissolved his marriage to Colleen E. Mitchell. Hughson assigns error to certain aspects of the court's determination, valuation, and division of the marital estate; the calculation of child support; the award of attorney fees; and the admission of certain evidence. He also assigns error to certain procedural rulings, or the lack thereof, by the district court and argues that he was denied procedural due process. For the reasons set forth herein, we affirm.

## II. BACKGROUND

The parties were married on October 2, 1993. They have two children, one born in January 1996 and one born in February 1999. The parties separated sometime between 2008 and January 2010.

Hughson is employed as an "HVAC" (heating, ventilation, air conditioning) installer. He also has an electrical license. In January 2005, the parties formed Mansfield Enterprises, Inc. (MEI), in which they each had a one-half interest. During the marriage Colleen worked for Hughson's HVAC business in various capacities, both before and after its incorporation as MEI, and she was an officer and director of MEI. In December 2009, the parties signed a shareholder agreement, and Colleen resigned her position as a director and secretary of MEI. Eventually, Hughson agreed to sell his one-half interest in MEI to John Lecher Zapata for $14,500, although his stock had not yet been transferred on the corporate books to Zapata at the time of trial. After agreeing to sell his interest in MEI to Zapata, Hughson opened a new HVAC business called Fire and Ice.

Colleen is a veterinarian. During the marriage, in addition to working for MEI, she owned and operated a veterinary practice called Animal Care Clinic. In January 2014, Colleen was diagnosed with and subsequently underwent treatment for cancer. At the time of trial, Colleen was working as a college instructor teaching veterinary technology. Since taking this job, the amount of business conducted by Animal Care Clinic has "definitely gone down."

In 2010, Hughson filed a complaint for dissolution of marriage in the district court (the first divorce case). On January 24, 2014, Hughson dismissed the first divorce case. On February 3, Colleen filed a complaint for dissolution of marriage in the district court (the second divorce case). Hughson filed an answer and counterclaim and later filed a motion seeking temporary custody of the children.

On February 28, 2014, the district court entered an order, awarding Colleen temporary legal and physical custody of the children. The court ordered Hughson to pay temporary child support of $3,000 per month, reduced to $1,500 per month for one child. The court stated that Colleen was to continue to receive $2,500 in monthly rental income. The court ordered the parties to not "transfer, encumber, hypothecate, conceal, or in any way dispose of real or personal property except in the usual course of business or for the necessaries of life" and to not "molest or disturb the peace of the other."

Hughson's attorney was permitted to withdraw on September 24, 2014, and Hughson appeared pro se at trial, which was held before the district court on April 27-28, 2015. By the time of trial, the parties had agreed to a parenting plan that provided Colleen would have sole legal and physical custody of the parties' remaining minor child. The parties had also reached an agreement with regard to the division of their personal property, but Colleen testified that Hughson had not given her certain property and asked the court to award her $600 to equalize that division. As pertinent to this appeal, the court heard evidence on the issues of child support and the valuation and division of the parties' remaining property. The record is voluminous, and for the sake of brevity, we have set forth the evidence relevant to each of Hughson's assignments of error on appeal in the corresponding argument sections below.

On August 7, 2015, the district court entered a decree dissolving the parties' marriage. Pursuant to the parties' agreement, the court granted Colleen sole legal and physical custody of the parties' remaining minor child, an arrangement the court found to be in the child's best interests. Also pursuant to the parties' agreement, the court did not grant Hughson specific visitation rights, but ordered that he may contact the child as he chooses and that Colleen may not

restrict his ability to attempt to contact the child and reestablish a relationship with her. The court ordered Hughson to pay child support of $1,750 per month.

With respect to division of the marital estate, the court awarded personal property pursuant to the parties' agreement and awarded Colleen a judgment of $600 to equalize that division. The court awarded Colleen real property totaling $1,205,000. This included ranch property located in Sioux County, which the court considered entirely marital property and valued at $665,000. The court awarded Hughson real property valued at $30,000. The court determined that Colleen's current residence was nonmarital property as it was purchased after the date of separation with nonmarital funds. The court divided the parties' interest in certain Alaskan property equally. Each party was awarded whatever retirement accounts, bank accounts, investment accounts and life insurance that were in his or her own name, free and clear of any claim by the other party. The court valued Hughson's accounts at $915,000 and Colleen's at $210,000. After taking into consideration premarital amounts set aside to Colleen, the court valued the veterinary practice at $52,500 and awarded it to her. The court valued MEI at $1,649,000 and awarded it to Hughson. The court awarded each party any and all motor vehicles currently in his or her possession together with any associated debt, and it ordered certain insurance proceeds to be split equally by the parties. In addition to the personal property awarded, which the court did not specifically value beyond specifying the $600 equalization payment, the court awarded Hughson marital property totaling $2,594,000 and Colleen marital property totaling $1,476,500. Accordingly, it ordered Hughson to make an equalization payment to Colleen of $600,000 for the non-personal property.

In addition to the equalization payments set forth above, the district court awarded Colleen $175,000 for K-1 income from MEI she did not receive from 2010-2013 and $13,500 as reimbursement for half the appraisal fees she incurred. The court awarded Colleen attorney fees of $30,000 and denied her request for alimony. The total money judgment awarded to Colleen against Hughson was $819,100.

After trial, Hughson retained new counsel, and his attorney filed a motion for new trial on August 14, 2015. The district court denied Hughson's motion, and Hughson subsequently perfected his appeal to this court.

## III. ASSIGNMENTS OF ERROR

Hughson asserts, reordered and restated, that the district court erred in (1) denying him due process and the right to a fair trial; (2) classifying the parties' property as marital or nonmarital and in valuing and dividing the marital estate; (3) calculating Colleen's income for child support purposes; and (4) determining its award of attorney fees to Colleen.

## IV. STANDARD OF REVIEW

In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Sellers v. Sellers*, 294 Neb. 346, 882 N.W.2d 705 (2016). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id.* A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly

untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Stanosheck v. Jeanette*, 294 Neb. 138, 881 N.W.2d 599 (2016).

An appellate court reviews a trial court's ruling on a motion for a new trial for abuse of discretion. *Hartley v. Metropolitan Util. Dist.*, 294 Neb. 870, 885 N.W.2d 675 (2016).

## V. ANALYSIS

### 1. DUE PROCESS CLAIMS

Hughson asserts that the district court erred in denying him due process and the right to a fair trial. While the concept of due process defies precise definition, it embodies and requires fundamental fairness. *Linda N. v. William N.*, 289 Neb. 607, 856 N.W.2d 436 (2014). Generally, procedural due process requires parties whose rights are to be affected by a proceeding to be given timely notice, which is reasonably calculated to inform the person concerning the subject and issues involved in the proceeding; a reasonable opportunity to refute or defend against a charge or accusation; a reasonable opportunity to confront and cross-examine adverse witnesses and present evidence on the charge or accusation; representation by counsel, when such representation is required by constitution or statute; and a hearing before an impartial decisionmaker. *Id.*

### (a) Testimony by Colleen's Attorney/Cross-Examination

Hughson argues that he was denied due process because the district court allowed Colleen's counsel to testify as a witness and denied him the opportunity to cross-examine both Colleen and her attorney.

At the start of trial, before making any opening remarks, Colleen's attorney asked the district court to swear him in as a witness. Colleen's attorney then testified that shortly before court started, John Zapata, a witness who was present in the courtroom, asked him to go into the hallway. When Colleen's attorney did so, Zapata informed him that Colleen "stole $101,000 from MEI and [Zapata] was going to get her. [Zapata] was going to turn her in to the Internal Revenue Service and get her prosecuted there. And it would all go away if we settled this case today." Colleen's attorney then asked the court to swear in Colleen to testify to threats she received that morning.

Once Colleen was sworn in, she testified that when her attorney was out of the room and "no one else was in here," Zapata stated, "I'm going to serve Colleen tomorrow. I'm going to amend the complaint to theft, conversion of property. And then he said something about . . . making liable statements."

The district court then had the following exchange with Zapata:

> THE COURT: All right. We can't have any of that go on, Mr. Zapata.
> MR. ZAPATA: Do you want to swear me in, Your Honor?
> THE COURT: No, I don't.
> MR. ZAPATA: Okay. I deny what they say.
> THE COURT: I'm sure you do. Let's go ahead and proceed. Any opening remarks?

At that point, Colleen's attorney requested an order sequestering witnesses, which we address further below.

Hughson did not object to Colleen's attorney being sworn in as a witness or to Colleen being called to testify about Zapata's threats. Hughson did not ask the district court for the opportunity to cross-examine Colleen and her attorney, nor did he ask the court to swear in Zapata to testify on this issue. A litigant's failure to make a timely objection waives the right to assert prejudicial error on appeal. *In re Estate of Clinger*, 292 Neb. 237, 872 N.W.2d 37 (2015). A trial judge has broad discretion over the conduct of a trial, and, absent abuse, that discretion should be respected. *Connelly v. City of Omaha*, 278 Neb. 311, 769 N.W.2d 394 (2009). Allowing Colleen's attorney to make a record of Zapata's alleged conduct was within the court's discretion, and Hughson has waived any error in that regard.

With respect to Colleen's attorney being sworn as a witness, Hughson points to Neb. Ct. R. of Prof. Cond. § 3-503.7(a), which states:

> (a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:
> (1) the testimony relates to an uncontested issue;
> (2) the testimony relates to the nature and value of legal services rendered in the case; or
> (3) disqualification of the lawyer would work substantial hardship on the client.

In response, Colleen's attorney notes Neb. Ct. R. of Prof. Cond. § 3-503.3(b), which provides, "A lawyer who represents a client in an adjudicative proceeding and who knows that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal."

In this case, Colleen's attorney alerted the court to and made a record of Zapata's alleged conduct that occurred directly before the start of trial. The court admonished Zapata and moved on with the divorce proceedings. The issue was not addressed further during the course of trial.

Hughson argues that through the testimony of Colleen's attorney, his witness, Zapata, was improperly impeached "with extrinsic evidence before the witness was ever confronted with those statements." Brief for appellant at 35. As noted above, Hughson could have objected to the procedure of calling Colleen's attorney as a witness or asked the court to swear in Zapata. He did not and has waived the right to assert prejudicial error on appeal. He subsequently called Zapata as a witness and questioned him thoroughly on topics more relevant to the divorce proceedings. Likewise, he cross-examined Colleen when she was called to testify on her own behalf with respect to the divorce proceedings, and he called her as a witness during the presentation of his own evidence. We find no violation of Hughson's due process rights. Hughson's arguments to the contrary are without merit.

### (b) Sequestration of Witnesses

Hughson argues that he was denied due process because the district court sequestered Zapata, a witness essential to the presentation of his case. "At the request of a party the judge shall order witnesses excluded so that they cannot hear the testimony of other witnesses" but the rule does not authorize exclusion of "a person whose presence is shown by a party to be essential to the presentation of his cause." Neb. Rev. Stat. § 27-615 (Reissue 2008).

At the start of trial, Colleen's attorney requested an order sequestering witnesses, except for Ericka Heiser and Rebekah Wolkenhauer, who had both worked on the appraisal of MEI. Colleen's attorney stated, "I will need to have them both in here at the same time while we put on evidence of the valuation." The district court asked Hughson for his position on the sequestration request, and Hughson stated, "I sent to [Colleen's attorney] on Friday a notice that I requested a special witness -- Zapata. I have the notice I sent [her attorney] by email." Hughson further stated that he preferred to "leave everybody here." The court ordered the witnesses sequestered. Because Hughson indicated that Zapata would be testifying, the court asked Zapata to leave the courtroom. At this point, Zapata stated, "Your Honor, if I'm correct, I believe I've been designated as an expert witness." The court replied, "Well, you are not an expert witness, so I'm going to have you leave the courtroom."

Hughson did not object to the district court's determination that Zapata was not an expert, attempt to qualify him as an expert, or otherwise provide evidence to show that Zapata's presence was necessary to the presentation of his case. Hughson argues that he was not given an opportunity to show that Zapata's presence was essential, but a pro se litigant will receive the same consideration as if he or she had been represented by an attorney, and, concurrently, that litigant is held to the same standards as one who is represented by counsel. *Friedman v. Friedman*, 290 Neb. 973, 863 N.W.2d 153 (2015). See, also, *In re Estate of Clinger*, 292 Neb. 237, 872 N.W.2d 37 (2015) (litigant's failure to make timely objection waives right to assert prejudicial error on appeal). Although Zapata was not present during Heiser's testimony, which occurred on the first day of trial, Hughson was. Hughson called Zapata as a witness on the second day of trial and questioned him about his purchase of Hughson's shares of MEI and his review of MEI's financial statements. He had the opportunity to question Zapata on the topics of his choice. Hughson's due process rights were not violated by the court's sequestration of Zapata.

(c) Recusal of Trial Judge

Hughson argues that he was denied due process because the district judge did not recuse himself despite a prior relationship with Zapata. Due process requires a neutral, or unbiased, adjudicatory decisionmaker. *In re Interest of S.J.*, 283 Neb. 507, 810 N.W.2d 720 (2012). Such decisionmakers serve with a presumption of honesty and integrity. *Id.* A party seeking to disqualify an adjudicator because of bias or prejudice bears the heavy burden of overcoming the presumption of impartiality. *Id.* A trial judge should recuse himself or herself when a litigant demonstrates that a reasonable person who knew the circumstances of the case would question the judge's impartiality under an objective standard of reasonableness, even though no actual bias or prejudice is shown. *Kalkowski v. Nebraska Nat. Trails Museum Found.*, 290 Neb. 798, 862 N.W.2d 294 (2015).

A party is said to have waived his or her right to obtain a judge's disqualification when the alleged basis for the disqualification has been known to the party for some time, but the objection is raised well after the judge has participated in the proceedings. *Blaser v. County of Madison*, 285 Neb. 290, 826 N.W.2d 554 (2013). The issue of judicial disqualification is timely if submitted at the earliest practicable opportunity after the disqualifying facts are discovered. *Tierney v. Four H Land Co.*, 281 Neb. 658, 798 N.W.2d 586 (2011).

Hughson acknowledges that he did not make a motion at trial, seeking to recuse the trial judge. He argues that he did not learn of "Zapata's prior relationship with the Court" until he was informed of this relationship by Zapata after trial. Brief for appellant at 31. Hughson relies on exhibits he offered in support of his motion for new trial. In exhibit 185, Hughson's affidavit in support of his motion, Hughson stated:

> I was not aware of the prior history between [Zapata] and the [trial judge] nor was I aware of the prior history between [Zapata] and the [trial judge's] previous law firm until after the Decree was entered. At that time I contacted [Zapata] and he disclosed the prior history with the [trial judge] and the [law firm].

Hughson also offered as exhibits orders entered in three separate cases in which Zapata was the plaintiff, showing that the trial judge in this case was recused as judge in each of those three cases. One of Hughson's exhibits included a corresponding motion to recuse, which indicates that in that particular case, the trial judge had disclosed that the law firm with which he was previously affiliated had represented Zapata as a client and that the judge had recused himself in another proceeding in which Zapata was a litigant.

Hughson does not assign error to the district court's denial of his motion for new trial. Errors must be both specifically assigned and specifically argued to be considered by this court. See *Pierce v. Landmark Mgmt. Group*, 293 Neb. 890, 880 N.W.2d 885 (2016). Accordingly, we have not considered whether the court abused its discretion in denying Hughson's motion for new trial with respect to the issue of recusal. We have considered Hughson's argument that he was denied a fair trial by the judge's failure to disclose his prior relationship with Zapata and recuse himself and find no denial of Hughson's due process rights. Clearly, in the present case, Zapata was not a litigant, and Hughson has not presented evidence to overcome the presumption of the trial judge's impartiality. Hughson's arguments are without merit.

### (d) Evidence of Compromise

Hughson argues that he was denied due process because the district court improperly allowed evidence of compromise and offers to compromise. Hughson argues that his due process rights were violated when "only some statements from failed settlement negotiations were allowed into evidence and then the Court relied on that evidence to make its award." Brief for appellant at 33.

Neb. Rev. Stat. § 27-408 (Reissue 2008) provides:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness,

negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Colleen called Hughson as a witness and her attorney questioned him about certain real property located in Sioux County. During this questioning, Colleen's attorney asked whether Hughson had told Colleen he would "agree to deed her all of [his] interest in [the] Sioux County ranch as long as she allows you 30 days of trespassing rights during each year." The following exchange between Hughson and the district court then occurred:

> [HUGHSON]: Your Honor, do we get to bring sections of settlement negotiations into this Court that have not been settled completely?
>
> THE COURT: I don't want to hear settlement negotiations, but if -- that's a valid question. Do you agree to do that? I don't want to know what you guys talked about in settlement.
>
> [HUGHSON]: And failed?
>
> THE COURT: Right.
>
> [HUGHSON]: Yes, Your Honor, we have talked about it. We also talked about -- I also wanted to put the land into a trust -- my two children into a trust. And that was voted down no by [Colleen].

Colleen's attorney resumed questioning Hughson about his understanding of the proposed "trespassing right," and Hughson testified in response without objecting. Specifically, Hughson agreed that if Colleen were awarded the Sioux County property he wanted to have "trespassing rights" for up to 30 days per year. He did not want to be limited to daylight hours in using this right because "in the winter time that's a very short window." He did agree, however, that if Colleen was awarded this property and he was given a "trespassing right," he would not bring any firearms onto the property.

In response to clarifying questions asked by the district court, Hughson testified, again without objecting, that if Colleen were awarded the property, he wanted "trespassing rights" because the property had been "passed down" in his family, he wanted to rebuild a relationship with his children, and he wanted to be able to "deal with something" if a problem, such as an injury to a person or a flat tire on a vehicle, arose while he was on his brother's nearby property. The court subsequently determined the Sioux County property was part of the marital estate and awarded it to Colleen. The court granted Hughson 30 days per year in which he "may trespass on the grassland only, during daylight hours, and only after calling Coleen to make sure neither Colleen nor [the parties' daughter] will be present."

Beyond his initial inquiry to the district court about the admissibility of settlement negotiations, Hughson did not object to any of the questioning about this "trespassing right." After his first exchange with the court on this issue, Hughson voluntarily stated that the parties had talked about a "trespassing right" and that they had also discussed placing the Sioux County property into a trust for their children. Hughson did not object to any further questions on this issue from either Colleen's attorney or the court. Hughson explained the nature of the rights he wished to retain in the event the property was awarded to Colleen. If the nature of those rights was not fully explained

during his questioning by Colleen's attorney and the court, he had the opportunity to present further evidence on this issue during his own evidence. To the extent that any of the evidence received was evidence of settlement negotiations, Hughson invited any such error by volunteering certain information after the court stated it did not want to hear settlement negotiations. A party cannot complain of error which the party has invited the court to commit. *Linda N. v. William N.*, 289 Neb. 607, 856 N.W.2d 436 (2014). Also, he has waived any error by failing to object to the additional questioning on this issue. See *In re Estate of Clinger*, 292 Neb. 237, 872 N.W.2d 37 (2015) (litigant's failure to make timely objection waives right to assert prejudicial error on appeal). Hughson has not shown a violation of his due process rights, and his arguments to the contrary are without merit.

## 2. CLASSIFICATION AND DIVISION OF MARITAL ESTATE

Under Neb. Rev. Stat. § 42-365 (Reissue 2008) the equitable division of property is a three-step process. *Sellers v. Sellers*, 294 Neb. 346, 882 N.W.2d 705 (2016). The first step is to classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage. *Id.* The second step is to value the marital assets and marital liabilities of the parties. *Id.* The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Id.* Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate. *Id.* Exceptions include property that a spouse acquired before the marriage, or by gift or inheritance. *Id.*

Hughson asserts that the district court erred in classifying the parties' property as marital or nonmarital and in valuing and dividing the marital estate. He argues that the court erred by (a) classifying the Sioux County property as marital, (b) using multiple valuation dates, (c) determining the value of MEI, and (d) including assets of MEI in its calculation of his accounts. We address each of Hughson's arguments in turn.

### (a) Classification of Sioux County Property

The district court determined that the Sioux County property was entirely marital property; valued it at $665,000; and awarded it to Colleen. In doing so, the court noted that Colleen's name was placed on the property after the parties' marriage. Hughson argues that the district court erred by doing so and that 50 percent of property should have been classified as premarital.

Hughson and his brother Kelly Mansfield inherited and took title as tenants in common to certain real property located in Sioux County in 1991 following their mother's death. Following Hughson and Colleen's marriage, several transfers of Hughson and Kelly's respective interests in various parcels of this inherited property occurred. We have not specifically detailed these transactions for the sake of brevity, but we note that Kelly transferred his one-half interest previously held in this property to Hughson and Colleen. The deeds reflect that Hughson has an undivided one-half interest in this property, and Hughson and Colleen, husband and wife, have an undivided one-half interest. The only exception is a parcel of the Sioux County property in which Hughson did not have a premarital interest and which is titled in Hughson and Colleen, husband and wife.

- 9 -

Colleen testified about her name appearing on the deeds for the Sioux County property. She testified that in 2007 when she learned that Hughson had had an affair, he told her, "I will put the ranch in your name to show you that I love you . . . I don't want you to divorce me." According to Colleen, when they purchased an additional parcel in 2010, Hughson said "he wanted to make sure that [her] name was on . . . his part of the ranch. He wanted to make sure he was proving to [her] that he was giving it to [her]." She testified further that she would have never spent money on such a purchase "if I didn't think that that property -- half of that entire Sioux County Ranch is mine because he gave me half and then the other half was deeded." According to Colleen, the deeds, as written, do not reflect the parties' true intentions. She testified:

> [T]he attorney didn't write it correctly to show that I truly was on half. I only got half of Kelly's part. The attorney didn't write it correctly [so] that it gave me that. But that is not what [Hughson's] intention was, it's not what he told me. The whole goal was for me to own that ranch equally with him.

In Hughson's deposition, taken April 17, 2015, he was asked about Colleen's assertion that after having an affair, he agreed to "put her name on the deed to [his] inherited ranchland in Sioux County if she would take [him] back." He testified, "I recall that transaction." He went on to testify that he felt he "was being blackmailed by Colleen" because "she had a disgruntled employee at both of us." He also testified, "I was trying to keep a marriage together, and trying to keep a family together."

The manner in which property is titled or transferred by the parties during the marriage does not restrict the trial court's ability to determine how the property should be divided in an action for dissolution of marriage. *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004). In an action for dissolution of marriage, a court may divide property between the parties in accordance with the equities of the situation, irrespective of how legal title is held. *Claborn v. Claborn*, 267 Neb. 201, 673 N.W.2d 533 (2004). The burden of proof to show that property is nonmarital remains with the person making the claim in a dissolution proceeding. *Gress v. Gress*, 271 Neb. 122, 710 N.W.2d 318 (2006).

The district court clearly credited Colleen's testimony that Hughson wanted her to have an undivided one-half interest in all of the Sioux County property and not just an undivided one-half interest in half of the property. Where the credible evidence is in conflict on a material issue of fact, an appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Linda N. v. William N.*, 289 Neb. 607, 856 N.W.2d 436 (2014). We defer to the court's determination in this regard and find no abuse of discretion.

### (b) Use of Multiple Valuation Dates

There is no "hard and fast" rule concerning valuation dates so long as the selected date bears a rational relationship to the property to be divided, and the selected date is reviewed for an abuse of discretion. *Myhra v. Myhra*, 16 Neb. App. 920, 756 N.W.2d 528 (2008).

Hughson argues that there is not a rational relationship between the property and the valuation dates in this case. In support of his argument, he notes that the court used valuation dates

prior to the dismissal of the first divorce case for the parties' businesses and real and personal property, but it primarily used valuation dates after the filing of the present case for the parties' bank, investment and retirement accounts.

In this case, the district court based its valuation dates on the evidence provided at trial. For example, it used valuation dates for the real property falling between May 2010 and February 2013. The real estate was appraised by a certified appraiser prior to dismissal of the first divorce case and those appraisal reports were admitted into evidence at trial in the present case. Hughson did not offer any more recent valuations at trial. He testified that he asked the appraiser "if we had time to do new appraisals, and he said no. He said it was weeks out."

The district court valued Hughson's retirement, bank, investment, and life insurance accounts at a total of $915,000 as reflected in exhibit 98, which compiles statements reflecting the values of each of these accounts. The dates reflected in exhibit 98 are primarily in 2013 and 2014, although the values as of 2010 were used for three of the accounts and one account was valued in 2015. Colleen's bank and retirement accounts were valued at dates in 2014 and 2015.

At trial, Hughson was asked about the accuracy of the information reflected in exhibit 98. He initially testified, "For the time to this Court, I will testify that this is accurate with the -- if an error is found, we can correct it." The district court received exhibit 98 but stated that Hughson needed to inform the court if he disagreed with the exhibit. Hughson then stated, "I'm going to disagree with it. With this much stuff, somewhere there's an error."

Hughson was then asked about exhibit 94, which is "a list of accounts that you failed to furnish information on or disclose" and supporting exhibits identifying these accounts. Hughson explained as follows:

> When you have an investment account and you call your stockbroker up and say, you know, I'm in high risk today but I think I'm going to be in low risk tomorrow and -- your account is closed and then a new account is started but changing your risk. And this is how it was explained to me. . . . I'm going to allow these to come in but with the explanation is that the lack of understanding on how an account moves is how come they were missed.

Hughson did not know if there was any money in any of these additional accounts listed in exhibit 94.

One of the supporting exhibits included in exhibit 94 is exhibit 81, a spreadsheet summarizing the parties' retirement and investment accounts in the first divorce case. Exhibit 81 shows that Hughson's retirement and investment accounts totaled $192,874 on December 31, 2009 and $253,707 on December 31, 2010.

Hughson focuses primarily on the valuation dates used for his retirement and other accounts and argues, "The multiple valuation dates of the retirement accounts have caused funds to be counted multiple times when money is moved from different accounts. If the real estate and businesses are being valued in 2010, the retirement accounts should be as well." Brief for appellant at 18. Hughson relies on exhibit 81 to argue that an increase in value from $253,707 in 2010 to $915,000 in 2015 is unrealistic. However, exhibit 98 includes bank accounts not reflected in exhibit 81. Exhibit 98 includes eight more accounts for Hughson than are shown in exhibit 81. He did not present evidence at trial to suggest that any of the accounts reflected in exhibit 98 no longer

exist, and he does not point in his brief to any specific instances where funds were counted more than once.

The parties prepared valuations of the real estate and businesses during the first divorce case and chose not to submit new valuations for those items of property in the current case. They did submit more current valuations of their bank, retirement, investment, and other accounts, and the district court treated the parties equally by using the more recent valuation dates for the accounts of both parties. If Hughson disagreed with any of the specific amounts reflected in exhibit 98, he could have presented his disagreements to the court during the course of his testimony on his own behalf. Or, he could have presented documentary evidence showing what he believed to be more accurate reflections of the values of his accounts as they existed at the time of trial. However, he did not do this. The district court used valuation dates supported by the record and that have a rational relationship to the property in the particular circumstances of this case. The court did not abuse its discretion by using multiple valuation dates.

## (c) Valuation of MEI

The district court valued MEI at $1,649,000 based on Heiser's appraisal. Hughson argues that the court erred in doing so.

### *(i) Relevant Evidence*

Heiser is a valuation analyst and department manager at Ketel Thorstenson. She performs business appraisal work and business consulting for the company and was hired by Colleen to appraise MEI. Heiser's report calculating the fair market value of 100 percent of the equity (excluding cash) of MEI as of December 31, 2010 was admitted into evidence. The district court also heard testimony from Heiser and Wolkenhauer, a senior manager in the audit department of Ketel Thorstenson who reviewed financial statements, obtained several documents, and "put together some financials" used by Heiser in her report.

Heiser based her report on financial information provided to her by Colleen and third parties. She stated, "Had we audited the underlying data, matters may have come to our attention, which would have resulted in our using amounts, which differ from those provided." Information was obtained primarily through MEI's 2006 through 2010 tax returns, "2010 QuickBooks," conversations with Colleen and Hughson on various dates, and various outside research sources. The financial and other pertinent information provided was accepted "without further verification as correctly reflecting its results of operations and its financial and business conditions." A site visit was conducted on November 15, 2011.

Heiser employed "a common Income Approach method" to value MEI's operating assets, a method known as "Capitalization of Earnings." Heiser calculated the value of the equity of MEI, excluding cash, at $1,649,000. She thoroughly explained the steps in arriving at her valuation both in her report and at trial. While we have not set forth those details at length in this opinion, we have reviewed both Heiser's report and testimony and Wolkenhauer's testimony. We do note, however, certain comments made by Heiser in her report. Heiser stated:

Essentially, [Hughson] has used [MEI] funds for his personal use and has apparently not shown these as distributions, but rather as expenses. Information to calculate the two-year

- 12 -

average of personal expenses was obtained from [Hughson] and are included as Attachments A and B. The personal expense totals were $124,281 and $123,649 in 2009 and 2010, respectively. These amounts are not reflected as distributions on the accompanying tax returns, so it is logical to conclude they were deducted.

Heiser also stated:

We used QuickBooks to obtain the accounts receivable value at December 31, 2010. We requested the accounts receivable value at December 31, 2010 from [Hughson] on several occasions but were not provided with this information. It is our understanding that the tax returns were prepared with estimated accounts receivable figures. Despite our requests to review tax return workpapers, we have not been provided such. Moreover, in a valuation report . . . prepared by Darrell G. Eskam . . ., he states . . . that the accounts receivable on the tax returns are incorrect. As such, for lack of better information, it appears that the QuickBooks accounts receivable is the most representative of the accounts receivable balance at December 31, 2010.

Finally, Heiser states that her calculation of value excludes cash balance because despite several attempts to obtain MEI's cash balance at December 31, 2010, she was not provided with this information.

We have also reviewed the report of Hughson's expert, Eskam, who concluded that "a reasonable estimate of the fair value of a 100% common stock interest of [MEI] as of December 31, 2009 is $586,800." Eskam rejected certain methodologies in determining the value of MEI. For example, he rejected the capitalization of earnings method "because of the lack of a reliable estimate of a stable, sustainable, ongoing benefit stream." Eskam calculated the value using various methods, assigned a weight to each value "intended to reflect [his] opinion of the relative importance or reliability of the methods when determining fair value." He assigned a weight of "0" to "Capitalization of Earnings Method" and "discounted Cash Flow Method - Summary Projections" and averaged "Book Value Method, Adjusted Book Value Method-Going Concern[,] Capitalization of Excess Earning Method[,] and Market Data Method-Bizcomps as of December 31, 2009" to arrive at a value of $586,800. For the sake of brevity, we have not set forth further details of Eskam's valuation report. Eskam did not testify at trial, and the district court sustained Colleen's hearsay objection when Hughson attempted to read from the report. The court received Eskam's report into evidence, however, and assured Hughson that it would review the report.

*(ii) Heiser's Valuation*

Hughson argues that Heiser's valuation of MEI was too unreliable and too speculative for the district court to accept as credible evidence. In their reports, both Heiser and Eskam explained their choice of valuation methods, the information they used, and the steps they took in arriving at their respective valuations of MEI. Clearly, the district court found Heiser's valuation to be more credible than that of Eskam, and we defer to the court's determination in that regard. See *Linda N. v. William N.*, 289 Neb. 607, 856 N.W.2d 436 (2014) (where credible evidence is in conflict on material issue of fact, appellate court considers and may give weight to circumstances that trial

judge heard and observed witnesses and accepted one version of facts rather than another). The district court based its valuation on the evidence presented at trial, and we find no abuse of discretion in its valuation of MEI.

### (iii) Dismissal of Previous Dissolution Proceedings

In connection with the valuation of MEI, Hughson also takes issue with certain statements made by the district court in the decree. The court stated:

> During the marriage, the parties formed MEI. They both owned 50% of the shares of stock in the business. During the pendency of the divorce, Hughson in violation of this Court's non-hypothecation order, sold his shares to [Zapata] for $14,500.00, despite the fact that the business was worth in excess of $1,000,000.00. The valuation done on the business was done in December of 2010, shortly before the parties were scheduled for trial [in the first divorce case]. Hughson dismissed that action for divorce shortly before trial. Since that time, he has, in this Court's opinion, allowed that company to fail.
>
> Based on Hughson's conduct, the Court finds that the best and most equitable value of MEI for purposes of this action is the value placed on the business by [Heiser] in December of 2010. That value is $1,649,000.00.

Hughson argues that in its valuation of MEI, the district court imposed a punitive sanction upon him either for dismissing the first divorce case or violating the nonhypothecation order entered in this case. He notes that a plaintiff has a statutory right to dismiss an action prior to final submission and that criminal or punitive sanctions are invalid in civil contempt proceedings. See Neb. Rev. Stat § 25-601 (Reissue 2008) (concerning dismissal without prejudice). See, also, *Sickler v. Sickler*, 293 Neb. 521, 878 N.W.2d 549 (2016) (criminal or punitive sanction invalid if imposed in proceeding instituted and tried as civil contempt, because it lacks procedural protections Constitution would demand in criminal proceeding).

The present case is not an action for contempt, and no punitive sanction was entered against Hughson. This case is an action for dissolution of marriage, in which the purpose of a property division is to distribute the marital assets equitably between the parties. See § 42-365. In its comments, the district court recited certain portions of the procedural history of both divorce cases and explained its choice of valuation date and value for MEI, according to the equities of this particular case. As set forth above, the court did not abuse its discretion in valuing MEI. Hughson's arguments are without merit.

### (d) Hughson's Accounts

The district court awarded Hughson his accounts as reflected in exhibit 98 and valued them at $915,000. Hughson argues that exhibit 98 includes three bank accounts which are actually assets of MEI and were included in the valuation of MEI. He argues that the supporting exhibits included within exhibit 98 clearly show that these three accounts are titled to MEI and not to Hughson personally. He argues that the valuation of his accounts should be reduced by $142,929, the total represented by the three accounts.

While it is true that documentation within exhibit 98 specifically identifies MEI as the "owner" of one of the three accounts and shows that statements for the three accounts are mailed to MEI at a particular post office box, there are other accounts within exhibit 98 connected with that same post office. Additionally, one of the accounts included in exhibit 98 (not an account identified by Hughson) had statements mailed to "HUGHSON MANSFIELD DBA MANSFIELD HEATING/COOLING" and later to "HUGHSON MANSFIELD DBA FIRE & ICE MECHANICAL." Hughson could have provided further testimony or other evidence about each of the accounts included in exhibit 98 at trial, but he did not. The crux of Hughson's argument is that the value of the three accounts identified by him was included in the valuation of MEI, but as discussed above Heiser's valuation of MEI excluded a cash balance. Hughson has not shown that the value of these three accounts was included in the value of MEI. The district court valued Hughson's accounts based on evidence provided at trial, and we find no abuse of discretion.

(e) Conclusion

The district court valued and divided the nonpersonal property portion of the marital estate as follows:

| Property Awarded | Hughson | Colleen |
|---|---|---|
| 6812 Highway 20 | | $ 275,000 |
| 820 W 3rd St Warehouse | | 80,000 |
| Sioux County property | | 665,000 |
| Vet clinic building | | 185,000 |
| Warehouse at Trudy's | $ 30,000 | |
| Retirement accounts | 915,000 | 210,000 |
| Veterinary practice | | 52,500 |
| MEI | 1,649,000 | |
| *Initial Total* | $2,594,000 | $1,467,500 |
| Equalization Payment | −600,000 | 600,000 |
| *Final Total* | $1,994,000 | $2,067,500 |

Although the division of property is not subject to a precise mathematical formula, the general rule is to award a spouse one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Millatmal v. Millatmal*, 272 Neb. 452, 723 N.W.2d 79 (2006). The division resulting from district court's award of a $600,000 equalization payment fits within the general rule, and we find no abuse of discretion. We affirm the district court's classification, valuation, and division of the marital estate.

3. CALCULATION OF CHILD SUPPORT

Hughson asserts that the district court erred in calculating Colleen's income for child support purposes. The court set Colleen's total monthly income for child support purposes at $5,000 per month and Hughson's at $17,000.

The paramount concern in child support cases, whether in the original proceeding or subsequent modification, remains the best interests of the child. *Incontro v. Jacobs*, 277 Neb. 275, 761 N.W.2d 551 (2009). In general, child support payments should be set according to the

- 15 -

Nebraska Child Support Guidelines. *Johnson v. Johnson*, 290 Neb. 838, 862 N.W.2d 740 (2015). In calculating child support, the court must consider the total monthly income, defined as income of both parties derived from all sources. Neb. Ct. R. § 4-204 (rev. 2016); *Burcham v. Burcham*, 24 Neb. App. 323, ___ N.W.2d ___ (2016).

At the time of trial, Colleen was employed at a school in Wyoming teaching veterinary technology. She had a contract for $52,556 per year, paid over 12 months ($52,556 ÷ 12 = $4,380 per month). She was also working occasionally at the vet clinic, making "basically enough to pay for the insurance, the property tax, and utilities, and to keep a person there." She testified that the "per week gross" from the clinic was between $500 and $800. She anticipated selling the building and not practicing in Chadron once the nonhypothecation order ended. Her practice had "kind of p[e]tered out" since she took the job in Wyoming, and she did not anticipate being "able to obtain any value out of the practice."

At the time of the hearing on the parties' requests for temporary orders, both parties were receiving $2,500 per month from MEI for rent. In the temporary order, the district court ordered that Colleen was to continue receiving this rental amount; the court did not make a similar finding in the decree. Based on the real estate awarded to Colleen, Hughson argues that the court should have included this $2,500 per month rent, as well as additional rental income, in its calculation of Colleen's income. In support of his argument, Hughson relies on exhibit 127 offered by Colleen at trial, which was a copy of a motion to modify temporary support filed by Colleen in August 2014. At that time both parties were receiving $2,500 monthly rent from MEI, Colleen was receiving $500 for Sioux County pasture rent, and Hughson was receiving $2,000 for the family residence/pasture. While Colleen was awarded these real properties, the record does not support a conclusion that they will be used in such a way as to generate similar rental income following dissolution of the parties' marriage. The court did not abuse its discretion in calculating Colleen's income for child support purposes.

### 4. ATTORNEY FEES

Finally, Hughson asserts that the district court erred in determining its award of attorney fees to Colleen. The court awarded attorney fees of $30,000. In doing so, the court found the evidence showed that Hughson paid his prior attorney fees from MEI, in essence, meaning that Colleen paid half of Hughson's attorney fees as she was a half owner of the company. The court also found an award of attorney fees appropriate, stating, "Hughson's conduct in dismissing a prior divorce case immediately before trial and continued refusal to participate in discovery has resulted in Colleen incurring fees well in excess of $50,000.00."

A dissolution court deciding whether to award attorney fees should consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services. *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016).

Hughson argues that he is being punished for dismissing the first divorce case, and he correctly points out that a plaintiff has a statutory right to voluntarily dismiss an action prior to final submission to the court, which right is not a matter of the court's discretion. See § 25-601(1);

*Knapp v. Village of Beaver City*, 273 Neb. 156, 728 N.W.2d 96 (2007). However, we do not read the court's comment about dismissal of the first divorce case as anything other than reference to the amount of time and fees required to accomplish dissolution of the parties' marriage. Hughson also argues that in awarding attorney fees, the court should not have considered any fees incurred by Colleen for work performed prior to filing of the current dissolution case. We disagree. Colleen filed her complaint for dissolution shortly after Hughson voluntarily dismissed his complaint. Certainly, legal work performed by Colleen's attorney during the first case filed by Hughson was used in the second divorce case filed by Colleen. Colleen submitted an affidavit from her attorney with an attached bill for attorney fees totaling $50,445.63 incurred in "defending the many frivolous and harassing actions filed by [Hughson] in two separate divorce actions." A total of $28,081 was incurred between March 2010 and December 2013; a total of $22,364.63 was incurred between January 2014 and April 28, 2015. This was a lengthy complex case, involving the valuation and division of multiple tracts of real estate and two businesses. The overall marital estate divided by the court was valued at more than $4,000,000. We find no abuse of discretion either in the court's award of attorney fees or in the amount awarded.

## VI. CONCLUSION

We find no violation of Hughson's due process rights. The district court did not abuse its discretion in its classification, valuation, and division of the marital estate, its calculation of Colleen's income for child support purposes or in awarding attorney fee.

AFFIRMED.