Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/25/2017 09:12 AM CDT

Shala R. Chevalier, appellant, v.
Metropolitan Utilities District
of Omaha, appellee.

___ N.W.2d ___

Filed July 18, 2017.    No. A-16-103.

1. **Directed Verdict: Evidence.** A directed verdict is proper only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law.
2. **Directed Verdict: Appeal and Error.** In reviewing a directed verdict, an appellate court gives the nonmoving party the benefit of every controverted fact and all reasonable inferences from the evidence.
3. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.
4. **Rules of Evidence: Appeal and Error.** When the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.
5. **Trial: Evidence: Appeal and Error.** In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party.
6. **Verdicts: Juries: Appeal and Error.** A jury verdict will not be set aside unless clearly wrong, and it is sufficient if any competent evidence is presented to the jury upon which it could find for the successful party.
7. **Verdicts: Appeal and Error.** In determining the sufficiency of the evidence to sustain a verdict in a civil case, an appellate court considers the evidence most favorably to the successful party and resolves evidentiary conflicts in favor of such party, who is entitled to every reasonable inference deducible from the evidence.

- 875 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
CHEVALIER v. METROPOLITAN UTIL. DIST.
Cite as 24 Neb. App. 874

8. **New Trial: Appeal and Error.** An appellate court reviews a trial court's ruling on a motion for a new trial for abuse of discretion.

9. **Judges: Words and Phrases.** A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

10. **Employer and Employee: Federal Acts: Discrimination.** The Family and Medical Leave Act of 1993 provides eligible employees up to 12 workweeks of unpaid leave in any 12-month period and prohibits employers from discriminating against employees for exercising their rights under the act.

11. ____: ____: ____. Basing an adverse employment action on an employee's use of leave, or in other words, retaliation for the exercise of rights under the Family and Medical Leave Act of 1993, is actionable.

12. **Employer and Employee: Federal Acts: Discrimination: Proof.** To establish a prima facie case of retaliation under the Family and Medical Leave Act of 1993, an employee must show that he or she exercised rights afforded by the act, that an adverse employment action was suffered, and that there was a causal connection between the exercise of rights and the adverse employment action.

13. **Fair Employment Practices: Discrimination: Proof.** For purposes of construing the Nebraska Fair Employment Practice Act in disparate treatment cases, the three-part *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), test is used and is as follows: (1) the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination; (2) if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection; and (3) should the defendant carry the burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

14. ____: ____: ____. A prima facie case of gender discrimination requires the plaintiff to prove that he or she (1) is a member of a protected class, (2) was qualified to perform the job, (3) suffered an adverse employment action, and (4) was treated differently from similarly situated persons of the opposite sex.

15. ____: ____: ____. The plaintiff in an employment discrimination action bears the burden to first prove to the fact finder by a preponderance of the evidence a prima facie case of discrimination.

16. **Employer and Employee: Discrimination: Proof.** Once the plaintiff has established a prima facie case of discrimination, the burden of

- 876 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
CHEVALIER v. METROPOLITAN UTIL. DIST.
Cite as 24 Neb. App. 874

production shifts to the employer to rebut the prima facie case by producing clear and reasonably specific admissible evidence that would support a finding that unlawful discrimination was not the cause of the employment action.

17. ____: ____: ____. In an employment discrimination action, when the employer articulates a legitimate, nondiscriminatory reason for the decision, raising a genuine issue of fact as to whether it discriminated against the employee, the employer's burden of production created by the employee's prima facie case is satisfied and drops from the case.

18. ____: ____: ____. In an employment discrimination action, after the employer has presented a sufficient, neutral explanation for its decision, the question is whether there is sufficient evidence from which a jury could conclude that the employer made its decision based on the employee's protected characteristic, despite the employer's proffered explanation.

19. **Rules of Evidence: Proof: Words and Phrases.** The best evidence rule is a rule of preference for the production of the original of a writing, recording, or photograph when the contents of the item are sought to be proved.

20. **Rules of Evidence: Proof: Fraud.** The purpose of the best evidence rule is the prevention of fraud, inaccuracy, mistake, or mistransmission of critical facts contained in a writing, recording, or photograph when its contents are an issue in a proceeding. By its terms, the best evidence rule applies to proof of the contents of a recording.

Appeal from the District Court for Douglas County: W. Mark Ashford, Judge. Affirmed.

Joy Shiffermiller and Abby Osborn, of Shiffermiller Law Office, P.C., L.L.O., for appellant.

Mark Mendenhall, of Metropolitan Utilities District of Omaha, for appellee.

Pirtle, Bishop, and Arterburn, Judges.

Pirtle, Judge.

## INTRODUCTION

Shala R. Chevalier brought an action against her employer, Metropolitan Utilities District of Omaha (MUD), in the district court for Douglas County, alleging gender and disability

- 877 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
CHEVALIER v. METROPOLITAN UTIL. DIST.
Cite as 24 Neb. App. 874

discrimination in a promotion decision, retaliation for her complaint of discrimination, and retaliation for taking leave from work pursuant to the Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C. § 2601 et seq. (2012). A jury found in favor of MUD on all causes of action, and the trial court accepted the verdicts and entered judgment in favor of MUD. Chevalier appeals. Finding no merit to her assignments of error, we affirm.

## BACKGROUND

Chevalier began working for MUD in July 1993. She alleges that she contracted Lyme disease in 2006, which resulted in her being disabled, and that MUD was aware of her disability. She alleges that throughout her employment she has been "harassed based on her disability."

In February 2010, Chevalier applied for a promotion to a supervisory position—supervisor of field engineering. Eight men and three women applied for the position, including Chevalier. Stephanie Henn, director of plant engineering, was the decisionmaker for the position. The position was given to David Stroebele, who Chevalier alleges was "less senior and less qualified" than she was and did not have all the required qualifications for the position. She claims she was denied the position based on her gender.

In July 2010, Chevalier filed a complaint of discrimination with the Nebraska Equal Opportunity Commission (NEOC) and the federal Equal Employment Opportunity Commission (EEOC). She claims that MUD began retaliating against her after she filed her complaint. On July 28, 2011, the NEOC issued a "right to sue" notice on Chevalier's discrimination charge.

Chevalier filed a complaint in the district court for Douglas County on September 22, 2011, and a motion to amend the complaint on December 16, 2013. The amended complaint asserted five causes of action. The first three causes of action alleged violations of the Nebraska Fair Employment Practice

- 878 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
24 NEBRASKA APPELLATE REPORTS
CHEVALIER v. METROPOLITAN UTIL. DIST.
Cite as 24 Neb. App. 874

Act, Neb. Rev. Stat. § 48-1101 et seq. (Reissue 2010) in that (1) MUD denied her a promotion based on her sex; (2) MUD denied her a promotion and subjected her to other discrimination and harassment based on her disability, specifically the effects she suffered from having contracted Lyme disease; and (3) MUD retaliated against her for complaining of discrimination and filing a complaint with the NEOC and EEOC. Chevalier's fourth cause of action alleged that MUD retaliated against her for using leave afforded to her under the FMLA. The fifth cause of action alleged that MUD's continued retaliation against her for her complaint of discrimination was actionable under Neb. Rev. Stat. § 20-148 (Reissue 2012). Chevalier later dismissed the fifth cause of action.

A jury trial was held on Chevalier's first four causes of action in her amended complaint. Chevalier presented evidence to show that she suffers from Lyme disease and has been treated by doctors for the disease since at least 2006. She was initially diagnosed and treated by a physician's assistant. In the spring of 2007, she started treating with a Lyme disease specialist, and she continued treating with him until 2009 or 2010. Chevalier testified that she told Charles Pattavina, her supervisor, about her Lyme disease because it was affecting her work. She stated that it was taking her longer to complete her work because she had problems with thought processing. Her other symptoms included joint pain, a decreased immune system, numbness and twitching in her face, and "shooting pains." She testified that she was still able to do her job with the symptoms she was having, but she had to take sick days off work "here and there" as a result of the Lyme disease. After she informed MUD of her disease, a safety meeting was held, at Chevalier's urging, to inform employees about Lyme disease. Chevalier testified that in 2009, Pattavina told her that she needed to stop taking so much sick leave. Henn, Pattavina's supervisor at the time, also discussed Chevalier's sick time with her and told her she needed to "get well."

- 879 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
CHEVALIER v. METROPOLITAN UTIL. DIST.
Cite as 24 Neb. App. 874

Chevalier also testified that after she saw the specialist in the spring of 2007, she gave MUD's nurse a letter from him stating why she had been off work. After Chevalier filed her complaint with the NEOC and EEOC in July 2010 claiming discrimination on the basis of disability, the physician's assistant filled out a medical questionnaire for the NEOC which indicated that Chevalier was not disabled, i.e., did not have difficulty performing any major life activities, and he noted only that she has periodic illness due to Lyme disease.

Pattavina testified that he was aware Chevalier claimed to have Lyme disease and that he recalled attending a safety meeting about the disease. He also testified that between 2003 and when he retired from MUD in 2010, Chevalier did not have difficulty performing her duties and he did not notice a decrease in the quality or quantity of her work. He did remember one time that Chevalier said she needed extra time to complete some reports because of her Lyme disease.

In regard to the hiring decision for the supervisor of field engineering position, Henn testified that in determining which candidate was best qualified, she reviewed information provided by human resources which included each candidate's personnel file and a spreadsheet which had each candidate's date of hiring, positions held, and absence history. She also reviewed the candidates' past performance appraisals.

Henn testified that she reviewed Chevalier's 2004 and 2007 performance appraisals and that there were some comments that caused her concern. The comments included Chevalier's needing to show more professionalism, needing to stay at her desk and concentrate on her job, and needing to not disturb others. These concerns were reflected in both the 2004 and 2007 appraisals.

Pattavina completed another performance appraisal of Chevalier in March 2010, the first since 2007. The performance appraisal took place after her interview for the job at issue, but before the hiring decision was made. The appraisal noted that she needs to show more professionalism, not disturb

- 880 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
24 NEBRASKA APPELLATE REPORTS
CHEVALIER v. METROPOLITAN UTIL. DIST.
Cite as 24 Neb. App. 874

others in the office, spend less time away from her work station, and improve on balancing field and office time. It also stated that she needs to "greatly improve prior to her being ready for more responsibility."

Henn testified that there was nothing in Chevalier's performance appraisals to indicate she was suffering from any sort of physical or mental disability, nor was there any indication that she needed or had requested an accommodation for a disability.

Henn also testified that she personally observed Chevalier on an almost daily basis talking and socializing with individuals who worked in the engineering department, which was on a different floor from Chevalier's work station. Henn said she rarely saw other field engineers in the engineering department.

Henn interviewed all 11 applicants for the position and asked all of them the same questions. After making her decision to hire Stroebele, she sent a selection letter to human resources recommending Stroebele for the position and stating the reasons why the other 10 candidates were not selected. Henn testified that there were three candidates that did not meet the minimum qualification requirements for the position. Other reasons for eliminating candidates from consideration included having recently been promoted to a different position, as well as negative remarks on performance appraisals or negative job performance.

In regard to Chevalier, the selection letter stated that she was "not a good candidate," noting that her performance appraisals reflect that she has a difficult time staying at her work station and concentrating on her job, as well as making too many personal telephone calls, disturbing others in the office, and needing a better balance between field and office time. Henn also noted that Chevalier tends to be away from her work area and not in the field, instead socializing with others. Henn concluded that these behaviors did "not exhibit good judgment or professionalism, which is critical in the Supervisor of

Field Engineering position." Henn further noted in the letter that Chevalier's attendance record is lacking, that she lacks the skills to be a "calm, even-keeled supervisor," and that she tended to overreact to negative feedback.

The jury found in favor of MUD on all causes of action, and the district court entered judgment accordingly. Chevalier filed a motion for new trial, which was overruled.

The record in this case is large. Accordingly, additional evidence will be discussed as necessary in the analysis section of the opinion.

## ASSIGNMENTS OF ERROR

Chevalier assigns that the trial court erred in (1) overruling her motion for directed verdict on her FMLA retaliation claim; (2) allowing MUD to present expert testimony that Chevalier never had Lyme disease; (3) upholding the jury verdicts; (4) sustaining MUD's objection to exhibit 133, her transcription of a tape-recorded conversation; and (5) overruling her motion for new trial.

## STANDARD OF REVIEW

[1,2] A directed verdict is proper only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law. *Balames v. Ginn*, 290 Neb. 682, 861 N.W.2d 684 (2015). In reviewing that determination, we give the nonmoving party the benefit of every controverted fact and all reasonable inferences from the evidence. *Id.*

[3-5] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *Pierce v. Landmark Mgmt. Group*, 293 Neb. 890, 880 N.W.2d 885 (2016). When the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for

- 882 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
24 NEBRASKA APPELLATE REPORTS
CHEVALIER v. METROPOLITAN UTIL. DIST.
Cite as 24 Neb. App. 874

an abuse of discretion. *Id.* In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party. *Id.*

[6,7] A jury verdict will not be set aside unless clearly wrong, and it is sufficient if any competent evidence is presented to the jury upon which it could find for the successful party. *Id.* In determining the sufficiency of the evidence to sustain a verdict in a civil case, an appellate court considers the evidence most favorably to the successful party and resolves evidentiary conflicts in favor of such party, who is entitled to every reasonable inference deducible from the evidence. *Id.*

[8,9] We review a trial court's ruling on a motion for a new trial for abuse of discretion. *Balames v. Ginn, supra*. A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

## ANALYSIS

### Motion for Directed Verdict.

Chevalier first assigns that the trial court erred in overruling her motion for directed verdict on her FMLA retaliation claim. Chevalier's fourth cause of action alleged that MUD retaliated against her for using leave afforded to her under the FMLA. She argues that a directed verdict on that cause of action should have been granted in her favor because the evidence was undisputed that Henn improperly considered leave Chevalier took pursuant to the FMLA, as a result of her Lyme disease, in denying her the promotion.

[10-12] "The [FMLA] provides eligible employees up to twelve work-weeks of unpaid leave in any twelve-month period and prohibits employers from discriminating against employees for exercising their rights under the [FMLA]. 29 U.S.C. §§ 2612, 2615(a)(2) (2000)." *Smith v. Allen Health Systems, Inc.*, 302 F.3d 827, 832 (8th Cir. 2002). Basing an

- 883 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
CHEVALIER v. METROPOLITAN UTIL. DIST.
Cite as 24 Neb. App. 874

adverse employment action on an employee's use of leave, or in other words, retaliation for the exercise of FMLA rights, is therefore actionable. *Id.* To establish a prima facie case of retaliation, an employee must show that he or she exercised rights afforded by the FMLA, that an adverse employment action was suffered, and that there was a causal connection between the exercise of rights and the adverse employment action. See *id*.

Chevalier claims that there is no dispute that she satisfied all the elements of a FMLA retaliation claim. She contends there is no question that she qualified for leave intermittently under the FMLA starting in 2007 and going forward based on her Lyme disease and that she suffered an adverse employment action in that she did not get the supervisor of field engineering promotion. Chevalier focuses her argument on the third requirement of a prima facie case—a causal connection between her exercise of rights and the adverse employment action. She contends that there was a causal connection because Henn improperly considered her leave under the FMLA in denying her the promotion.

Before addressing Chevalier's causal connection argument, we first note that the evidence does not demonstrate that she qualified for leave under the FMLA based on her Lyme disease, as she contends. The evidence does not show that Chevalier's Lyme disease was a serious health condition eligible for leave under the FMLA. MUD had no record that she ever applied for leave under the FMLA based on a chronic medical condition, such as Lyme disease. Bonnie Savine, MUD's director of human resources, testified that an employee would have to apply for such leave and have it approved, and then when work days were missed, the employee would have to identify the absence as leave under the FMLA for it to be considered as such. Human resources records of Chevalier's absences gave no indication any absences were related to Lyme disease or a FMLA-approved absence. Rather, each absence was coded as only a sick day.

- 884 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
CHEVALIER v. METROPOLITAN UTIL. DIST.
Cite as 24 Neb. App. 874

In regard to Chevalier's argument that Henn considered her FMLA absences in denying her the promotion, the evidence shows that Henn did consider her past attendance history. Henn testified that she considers each employee's attendance record when making a promotion decision. She testified that she reviewed Chevalier's absence history as provided by human resources. She also relied on past appraisals, which stated Chevalier's number of absences and the total number of work hours missed due to illness. Henn's reasons for not promoting Chevalier, as set forth in the selection letter, included the ongoing concerns with her attendance.

Although Henn considered Chevalier's past attendance record, she testified that she did not know what hours or days of sick leave, if any, were related to Chevalier's Lyme disease or were FMLA-approved absences. She only knew how many times and how many hours Chevalier missed work as a result of being sick. For instance, her 2007 performance appraisal, which Henn reviewed, stated that she had missed work due to illness 139.5 hours over nine occasions in the past year. As previously stated, the absence history from human resources gave no indication any absences were related to Lyme disease or were FMLA-approved absences; each absence was coded as only a sick day. Therefore, the evidence does not show that Henn retaliated against Chevalier by relying on her FMLA absences in denying her the promotion.

A directed verdict is proper only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law. In reviewing that determination, we give the nonmoving party the benefit of every controverted fact and all reasonable inferences from the evidence. *Balames v. Ginn*, 290 Neb. 682, 861 N.W.2d 684 (2015).

The evidence did not indisputably show that any absences taken by Chevalier were taken pursuant to the FMLA, nor did it indisputably show that Henn considered the FMLA-approved absences in denying her the promotion. The evidence showed

- 885 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
24 NEBRASKA APPELLATE REPORTS
CHEVALIER v. METROPOLITAN UTIL. DIST.
Cite as 24 Neb. App. 874

that Henn considered attendance when making the promotion decision, but that Henn did not know or have any reason to believe that any of Chevalier's absences were FMLA-approved absences based on a disability. Accordingly, the trial court did not err in overruling Chevalier's motion for directed verdict on her FMLA retaliation claim.

*MUD's Expert Testimony as to*
*Chevalier's Lyme Disease.*

Chevalier next assigns that the trial court erred in allowing MUD to present expert testimony that Chevalier did not have Lyme disease. She argues that MUD conceded she was on qualifying leave under the FMLA and that MUD cannot now challenge whether she had a disability necessitating FMLA leave.

Chevalier challenges the admission into evidence of a videotaped deposition of Dr. Cezarina Mindru, who specializes in internal medicine and infectious disease, as well as a transcript of his deposition. Chevalier did not object to either exhibit, and the videotaped deposition was played for the jury. In the deposition, Mindru stated that it was his opinion within a reasonable degree of medical certainty that based on a February 2007 blood test, Chevalier did not have Lyme disease. He also testified that a December 2006 blood test indicated that Chevalier did not have Lyme disease. Mindru further stated that it was his opinion within a reasonable degree of medical certainty that Chevalier was not disabled as a result of the symptoms she complained of.

After the videotaped deposition was played, other exhibits that were referenced during the deposition were offered into evidence, including Mindru's curriculum vitae, the February 2007 and December 2006 laboratory test results, and Mindru's medical report. Chevalier only objected to the medical report, and the objection was sustained.

Chevalier argues that MUD was estopped from presenting expert evidence that Chevalier did not have Lyme disease

- 886 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
24 NEBRASKA APPELLATE REPORTS
CHEVALIER v. METROPOLITAN UTIL. DIST.
Cite as 24 Neb. App. 874

because MUD conceded she was on qualifying leave under the FMLA. Chevalier cites to testimony from Savine in support of her allegation. However, the testimony that Chevalier refers to has nothing to do with Chevalier's Lyme disease. The testimony relied on by Chevalier refers to supplemental sick leave Chevalier took in 2012 and 2013 as a result of anxiety and depression. Savine stated that Chevalier took leave from work for 6 months in 2012 and 2013 pursuant to MUD's supplemental sick leave program. She testified that the supplemental sick leave ran concurrent with leave pursuant to the FMLA, at least for up to 12 workweeks. Thus, the evidence Chevalier relies on only shows that Chevalier took qualifying leave under the FMLA in 2012 and 2013 as a result of anxiety and depression. It does not show that MUD conceded she was on leave under the FMLA as a result of her Lyme disease.

Chevalier claims she was diagnosed with Lyme disease in 2006, and there is some evidence of this. However, as previously discussed, there is no evidence that she took any leave under the FMLA based on a diagnosis of Lyme disease or that she made any requests for leave under the FMLA between 2006 and 2009. Her sick days during those years are coded as only sick days, and there was no indication that those days were related to Lyme disease or were FMLA-approved absences. Savine testified that she was not aware that any of Chevalier's absences prior to January 2012 were approved pursuant to the FMLA. MUD did not concede that Chevalier took approved leave under the FMLA prior to 2012 and did not concede that she took any leave under the FMLA as a result of Lyme disease.

We also note that Chevalier did not file a motion in limine in regard to Mindru's testimony, nor was there a *Daubert/ Schafersman* challenge to exclude Mindru's testimony. See *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001). In

- 887 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
24 NEBRASKA APPELLATE REPORTS
CHEVALIER v. METROPOLITAN UTIL. DIST.
Cite as 24 Neb. App. 874

addition, Chevalier did not object to the admission of Mindru's videotaped deposition at trial.

Further, Chevalier alleged she was discriminated against in the promotion decision because of her disability, Lyme disease. Thus, Chevalier made her disability from Lyme disease an issue at trial. MUD was entitled to present evidence in regard to whether Chevalier had Lyme disease, and if she did, whether she was disabled as a result. Chevalier opened the door on the issue, making Mindru's testimony relevant. This assignment of error is without merit.

*Jury Verdicts.*

Chevalier assigns that the trial court erred in upholding the jury verdict on her gender discrimination claim because no reasonable jury could find that MUD's stated reasons for hiring Stroebele over her were not pretexts for unlawful discrimination.

Chevalier sought to prove that she was not promoted because of gender discrimination and that MUD's stated reasons for promoting a male colleague, Stroebele, instead of her were pretextual. Chevalier asserted that she and the two other female applicants, Sherri Meisinger and Kristina Hartley, were better qualified than Stroebele. MUD maintained that it hired Stroebele because he was the best qualified person for the job.

[13] The Nebraska Supreme Court has adopted a three-part test, commonly referred to as the "*McDonnell Douglas* test," for purposes of construing the Nebraska Fair Employment Practice Act in disparate treatment cases. See *Father Flanagan's Boys' Home v. Agnew*, 256 Neb. 394, 590 N.W.2d 688 (1999). See, also, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). The three-part *McDonnell Douglas* test has been set forth by our Supreme Court previously:

"First, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of

- 888 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
CHEVALIER v. METROPOLITAN UTIL. DIST.
Cite as 24 Neb. App. 874

discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' . . . Third, should the defendant carry the burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."

*Harris v. Misty Lounge, Inc.*, 220 Neb. 678, 682, 371 N.W.2d 688, 691 (1985) (citations omitted) (quoting *Zalkins Peerless Co. v. Nebraska Equal. Opp. Comm.*, 217 Neb. 289, 348 N.W.2d 846 (1984).

[14,15] A prima facie case of gender discrimination requires the plaintiff to prove that he or she (1) is a member of a protected class, (2) was qualified to perform the job, (3) suffered an adverse employment action, and (4) was treated differently from similarly situated persons of the opposite sex. *Helvering v. Union Pacific RR. Co.*, 13 Neb. App. 818, 703 N.W.2d 134 (2005). The plaintiff bears the burden to first prove to the fact finder by a preponderance of the evidence a prima facie case of discrimination. *Id.*

[16,17] Once the plaintiff has established a prima facie case of discrimination, the burden of production shifts to the employer to rebut the prima facie case by producing "'clear and reasonably specific'" admissible evidence that would support a finding that unlawful discrimination was not the cause of the employment action. *Hartley v. Metropolitan Util. Dist.*, 294 Neb. 870, 893, 885 N.W.2d 675, 694 (2016). When the employer articulates a legitimate, nondiscriminatory reason for the decision, raising a genuine issue of fact as to whether it discriminated against the employee, the employer's burden of production created by the employee's prima facie case is satisfied and drops from the case. *Id.*

[18] After the employer has presented a sufficient, neutral explanation for its decision, the question is whether there is

- 889 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
24 NEBRASKA APPELLATE REPORTS
CHEVALIER v. METROPOLITAN UTIL. DIST.
Cite as 24 Neb. App. 874

sufficient evidence from which a jury could conclude that the employer made its decision based on the employee's protected characteristic, despite the employer's proffered explanation. *Hartley v. Metropolitan Util. Dist., supra*. At this stage, the employee "'must be afforded the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."'" *Id.* at 894, 885 N.W.2d at 694, quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). "'That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination "by showing that the employer's proffered explanation is unworthy of credence."'" *Id.* at 894, 885 N.W.2d at 694.

The supervisor of field engineering position was posted on January 20, 2010. The supervisor was responsible for planning, directing, and supervising the work of 17 field engineering and utility locator personnel of the plant engineering division. There were several minimum requirements for the position, including "two years of college in an area related to Engineering. Four-year Engineering, or Engineering Technology degree preferred"; a "[m]inimum five (5) years' experience in Engineering or gas/water operations with progressive responsibilities"; and "[m]ust have utility locating experience in the last five (5) years, preferable in an ongoing capacity. Utility Locator operator qualification preferred." Utility locating is the process of locating existing gas or water utilities in the field.

Chevalier contends that MUD's claim that Stroebele was the better qualified candidate is pretexual because he did not meet all of the qualifications for the position, specifically the education requirement. As previously noted, the supervisor of field engineering posting required that eligible candidates have a minimum of 2 years of college in an area related to engineering. Chevalier contends that most of Stroebele's classes were not engineering related and that Stroebele did not complete his

- 890 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
CHEVALIER v. METROPOLITAN UTIL. DIST.
Cite as 24 Neb. App. 874

2-year degree in general studies until May 2011, after he had been in the position for a year.

Chevalier contends that she and the other two female candidates, Meisinger and Hartley, had the requisite education and that their education was engineering focused. Chevalier attended a vocational technical school for 2 years, where she studied drafting. She got a certificate upon completion of the program, but not an associate's degree. Hartley had a bachelor's degree in interior design, and Meisinger had a bachelor's degree in design engineering technology and an associate's degree in construction engineering technology.

Although Chevalier contends that Stroebele did not meet the education requirement, Savine testified that he did. She explained that human resources looks primarily at how many years of schooling a candidate has. She testified that in her opinion, 2 years of college is the equivalent of 48 hours of course credit. In January 2010, when the job was posted, Stroebele had a total of 70.5 credit hours from college courses. She further testified that MUD interprets the language "in an area related to Engineering" very broadly and that there is no standard for determining what courses qualify as being engineering related or any specifically prescribed courses. Savine also testified that the job Stroebele held before he was promoted to supervisor of field engineering had the same education requirement—2 years of college in an area related to engineering—and that he met the requirement at the time he took that position in 2005.

Chevalier also argues that Stroebele lacked supervisory and other experience compared to herself and the other female candidates. The job required that the successful candidate have a "minimum five (5) years' experience in Engineering or gas/water operations with progressive responsibilities." Chevalier contends that she and the two other female candidates had more relevant experience and more seniority than Stroebele.

Stroebele began working for MUD in 1998 as a pipelayer and later as a machine operator, both in the construction

- 891 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
CHEVALIER v. METROPOLITAN UTIL. DIST.
Cite as 24 Neb. App. 874

area of MUD. He moved to the engineering department in September 2000, where he worked as a field engineer II. In 2005, he was hired by Henn as a senior engineering technician. He remained in this position, with Henn as his supervisor, until his promotion to supervisor of field engineering in 2010. Chevalier notes that Stroebele did not have any supervisory responsibilities in any of his prior positions. However, there was no requirement of any supervisory experience. She also points out that Stroebele had less seniority than the three female candidates, but seniority was not listed as a factor considered in the promotion decision.

Chevalier had been employed by MUD since 1993. She started working as a drafter, and in 1995, she became a field locator. She advanced to the position of field engineer II in 2005 and field engineer I in 2009. Chevalier contends that all of her experience has been in engineering-related areas—drafting, locating, and field engineering. She had been a locator for 10 years before being promoted to a field engineer. She testified that locators and field engineers are both areas that the supervisor of field engineering would supervise. Her past experience also included helping train field services employees to use a computer program to look up services when out in the field. She also wrote the test taken by locators to demonstrate their ability to locate.

Chevalier contends that the other two women passed over for the promotion also had superior work experiences compared to Stroebele. Hartley had been working for MUD for almost 31 years. She started out working in customer service and then transferred to the drafting department where she worked her way up from a drafting technician IV to a senior drafting technician. She then became a senior engineering technician, a position she held for 16 years.

Meisinger had worked full time for MUD since 1990. She started out in the drafting department as a draftsperson and later moved to field engineering. After field engineering, she took a position as a design engineering technician and later

- 892 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
CHEVALIER v. METROPOLITAN UTIL. DIST.
Cite as 24 Neb. App. 874

became a supervisor of drafting. She was in the engineering department for 20 years before she took the purchasing department position she had at the time of trial.

Chevalier further argues that performance appraisals completed in 2010 were used as a tool to justify Henn's decision to promote a less-qualified man to the position. Chevalier had not been given an appraisal for 3 years prior to the appraisal she received in March 2010, during the time the promotion decision was being made. Similarly, Hartley had not been given an appraisal for 7 years before being evaluated in February 2010. Chevalier suggests that the appraisals were done for the purpose of portraying the female candidates in a negative light and could be used to justify its decision to promote Stroebele. Chevalier specifically directs our attention to the language in her 2010 appraisal, which states: "[Chevalier n]eeds to show more professionalism, not disturb others in . . . Engineering. [Chevalier] needs to show improvement on balancing field and office time. While [Chevalier] has many skills, she needs to greatly improve prior to her being ready for more responsibility." The evidence shows, however, that these concerns or similar concerns were not new and were reflected in previous appraisals. The comments in her 2010 appraisal did not reflect anything new in regard to Chevalier's work habits.

Hartley's appraisal indicated that she did not show the potential for additional responsibilities, specifically noting that she needed to work on "her listening and communication skills."

Although the timing of the 2010 appraisals may seem suspicious, there was evidence that they were done as a result of MUD's requiring that all employees have a current appraisal. In an internal memorandum dated April 20, 2009, human resources encouraged all supervisors to get their employee files up to date, noting there had been several job selection grievances that were difficult to evaluate without written documentation of that employee's performance. Savine

- 893 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
24 NEBRASKA APPELLATE REPORTS
CHEVALIER v. METROPOLITAN UTIL. DIST.
Cite as 24 Neb. App. 874

testified that in 2009, annual appraisals were not being done by all supervisors. An audit of appraisals was conducted in 2009 which showed that in the plant engineering division, where Chevalier and Hartley both worked, about half of the 28 employees had not had an appraisal since 2007. Several male and female employees had not had appraisals since 2003, like Hartley. MUD's board of directors discussed the matter in June 2009, and in November 2009, MUD's president vowed to the board that the appraisals would be caught up and done in a timely manner going forward. In April 2010, the president indicated to the board that all supervisors were up to date on their performance appraisals.

Also, the 2010 appraisals of Chevalier and Hartley were not the only information Henn relied on in determining that neither of them was the strongest candidate for the supervisor of field engineering position. Henn also relied on each candidate's personnel file; a spreadsheet which had each candidate's date of hiring, positions held, and absence history; past performance appraisals; and interviews she conducted with each candidate. Further, in regard to Hartley, Henn was her supervisor so she had knowledge of her day-to-day work habits.

Chevalier also argues that Henn changed the qualification requirements for the supervisor of field engineering position for the purpose of disqualifying Meisinger from consideration. Before the position was posted, Henn added the requirement that the applicant must have recent locating experience, within the past 5 years. Before Henn's changes, locating experience was not required for the position. Meisinger had previous locating experience, but it was more than 5 years earlier. The change in the job requirements also disqualified one of the male candidates.

Savine testified that a supervisor is usually the one who recommends that the requirements for a job be changed, but others have to agree to it and give their approval. Specifically, she testified that Henn's changes to the requirement for the supervisor of field engineering position would have been

- 894 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
24 NEBRASKA APPELLATE REPORTS
CHEVALIER v. METROPOLITAN UTIL. DIST.
Cite as 24 Neb. App. 874

approved by the vice president of engineering and construction, as well as by human resources.

Henn testified that she initiated the change in the job requirements to require recent locating experience, but the changes were approved by her supervisor and by human resources. She testified that she made the change because Pattavina, who was retiring from the supervisor of field engineering position, did not know how to utility locate. She testified that this caused issues in the past and that she believed it would be more efficient if the supervisor could locate. She also testified that when she redrafted the job requirements, she did not know who was going to apply for the position.

The evidence is clear that Chevalier made a prima facie case of discrimination (she was a member of a protected group; was qualified and applied for a promotion; was rejected; and a similarly situated employee, not part of the protected group, was promoted instead). MUD produced evidence that could support a finding that unlawful discrimination was not the cause of the promotion decision and that it promoted Stroebele over Chevalier because he was the better qualified candidate. The jury apparently found that Chevalier did not prove that MUD's proffered reason was a pretext for unlawful discrimination. There was sufficient evidence to support the jury verdicts, and we find no merit to Chevalier's assignment of error.

*Sustaining of Objection*
*to Exhibit 133.*

Chevalier next argues that the trial court erred in sustaining MUD's objection to exhibit 133, her own transcription of a tape-recorded conversation between herself and Patrick Tripp, a MUD attorney. In April 2011, about 10 months after Chevalier had filed her discrimination claim, she was called into Tripp's office and questioned about an obscene drawing that included a picture of a construction foreman. The drawing had been copied and sent to various MUD employees through

- 895 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
CHEVALIER v. METROPOLITAN UTIL. DIST.
Cite as 24 Neb. App. 874

interoffice mail. After MUD conducted an investigation, it concluded that Chevalier had distributed the drawing, and she was suspended from work without pay for 3 days.

Without informing Tripp, Chevalier recorded their conversation in April 2011 when she was called into his office. She then transcribed the meeting because the recording was "kind of muffled." She offered the transcription into evidence, exhibit 133, contending that it was evidence of retaliation against her for filing a discrimination claim. MUD objected based on foundation and not the best evidence, and the court sustained the best evidence objection.

When Tripp testified, he stated that he had listened to Chevalier's recording of their meeting and that it was "pretty much incomprehensible." During a break at trial, he listened to the tape-recorded conversation again and read Chevalier's transcription. He testified that he could not tell if the transcript was accurate or not because the recording was "indecipherable." Chevalier offered exhibit 133 into evidence a second time, and MUD objected based on foundation. The court sustained MUD's objection.

[19,20] Chevalier contends that exhibit 133 should have been admitted into evidence because the original recorded conversation was unavailable due to the fact that it was "kind of muffled" and would have been hard for the jury to understand. However, as the trial court initially ruled, exhibit 133 was not the best evidence of the conversation between Chevalier and Tripp. The best evidence rule, Neb. Evid. R. 1002, Neb. Rev. Stat. § 27-1002 (Reissue 2016), is a rule of preference for the production of the original of a writing, recording, or photograph when the contents of the item are sought to be proved. See *State v. Kula*, 260 Neb. 183, 616 N.W.2d 313 (2000), *overruled on other grounds, State v. Dubray*, 289 Neb. 208, 854 N.W.2d 584 (2014). The purpose of rule 1002 is the prevention of fraud, inaccuracy, mistake, or mistransmission of critical facts contained in a writing, recording, or photograph when its contents are an issue in a proceeding. By its

- 896 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
24 NEBRASKA APPELLATE REPORTS
CHEVALIER v. METROPOLITAN UTIL. DIST.
Cite as 24 Neb. App. 874

terms, rule 1002 applies to proof of the contents of a recording. See *id.*

Although exhibit 133 was excluded from evidence, Chevalier testified at length about the conversation with Tripp, as well as the outcome of the investigation. Tripp also testified about the conversation he had with Chevalier in April 2011 and the investigation into the obscene drawing. Accordingly, there was other evidence of the April 2011 conversation between Chevalier and Tripp.

In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party. *Pierce v. Landmark Mgmt. Group*, 293 Neb. 890, 880 N.W.2d 885 (2016). The exclusion of exhibit 133 did not unfairly prejudice a substantial right of Chevalier's. Accordingly, the trial court did not abuse its discretion in sustaining MUD's objection to exhibit 133.

*Motion for New Trial.*

Chevalier's last assignment of error is that the trial court erred in overruling her motion for new trial. Chevalier raised the same issues in her motion for new trial that she raises in her other assignments of error before us and which are discussed above. Having found no merit to Chevalier's first four assignments of error, we conclude that the trial court did not err in overruling her motion for new trial.

## CONCLUSION

We conclude that the trial court did not err in overruling Chevalier's motion for directed verdict on her FMLA retaliation claim; allowing MUD to present expert testimony that Chevalier never had Lyme disease; entering judgment on the jury verdicts; sustaining MUD's objection to exhibit 133, her transcription of a tape-recorded conversation; and overruling her motion for new trial. Accordingly, the trial court's judgment in favor of MUD is affirmed.

AFFIRMED.